544 S.E.2d 835

**The STATE, Respondent,**

v.

**Robert B. CARTER, Petitioner.**

No. 25266.

Supreme Court of South Carolina.

Heard Feb. 6, 2001.

Decided March 26, 2001.

Rehearing Denied April 26, 2001.

C. Rauch Wise, of Greenwood, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy General Robert E. Bogan, and Senior Assistant Attorney General Charles H. Richardson, all of Columbia; and Solicitor J. Gregory Hembree, of Conway, for respondent.

## ON WRIT OF CERTIORARI TO
## THE COURT OF APPEALS

MOORE, Justice.

We granted a writ of certiorari to review the Court of Appeals' unpublished opinion affirming petitioner's convictions for first degree burglary, kidnaping, first degree criminal sexual conduct, possession of a weapon during the commission of a violent crime, and unlawful use of a telephone.[1] Petitioner claims the State failed to establish a sufficient chain of custody for the admission of a blood sample used to match his DNA with evidence found at the scene. We affirm.

### FACTS

Victim lived alone in the owner's apartment of a small motel in Myrtle Beach. She testified that about 5:30 a.m. on December 3, 1994, she awoke to find a man on top of her in her bed. He put a pillowcase over her head and threatened to kill her while holding a cold metal instrument under her jaw that she thought was a gun. After giving her a choice between fellatio or intercourse, the assailant put his penis in Victim's mouth under the pillowcase. When he became dissatisfied with her performance, he masturbated into her mouth and insisted she swallow the semen. He then tied her up and left the apartment.

After freeing herself, Victim found a pocket-knife on her living room floor which she gave to police along with the pillowcase and the clothing she was wearing at the time of the assault. She did not see her assailant's face and could give police no identification.

About six weeks later, on the afternoon of January 14, 1995, Victim received a telephone call from an unidentified male who asked her, "Have you woken up with any [penises] in your mouth lately?" Victim recognized the voice as that of her assailant. She received a similar call ten days later in the early morning hours of January 24. On February 1, she received a third call that she recorded. She also traced the caller's telephone number.

---

1. Petitioner was sentenced to life for burglary, thirty years concurrent for kidnaping, thirty years consecutive for criminal sexual conduct, and consecutive terms of five and ten years respectively on the weapon and telephone charges.

When Victim took this information to police, she listened to the recording with Detective Starr. Detective Starr told her the call came from a phone booth outside a nearby motel, the Lighthouse, and asked if she knew anyone living there. Victim recalled that petitioner, whom she knew because she was friendly with his parents,[2] was living at the Lighthouse. She then identified the voice on the tape as petitioner's.

At trial, the State introduced the testimony of two police officers who saw petitioner in the vicinity of the phone booth outside the Lighthouse at approximately the time the third phone call was made. In addition, the State's expert testified that semen[3] was found on the pillowcase given to police which matched petitioner's DNA as indicated by the blood sample taken from him before trial.

Petitioner's blood sample was drawn pursuant to a consent order requiring him to submit to blood and saliva sampling. Petitioner was escorted by police to the hospital where Dr. Proctor supervised the taking of blood and saliva samples which he testified were placed in a kit supplied by SLED. This kit was a cardboard box that had styrofoam containers in it to hold the glass tubes of blood. Dr. Proctor sealed the kit with a type of security tape that cannot be pulled off without leaving obvious signs of tampering.

Deputy Johnson, who witnessed the sampling,[4] transported the taped kit to the Myrtle Beach Police Department and gave

---

**2.** Victim testified petitioner's parents had lived at her motel for about a year until the August before the attack and petitioner had stayed with them for part of that time. She had given petitioner's father a key to her apartment on one occasion when she went out of town. This key was never definitively linked to petitioner, however. Victim's apartment showed no signs of forced entry after the attack.

**3.** Expert testimony indicated there were actually two stains on the pillowcase that were tested. The smaller stain was semen identified by the presence of a male-specific protein, P–30, and the other, larger stain was a mixed semen and saliva stain. Both stains matched petitioner's DNA. As part of the defense case, petitioner's expert testified he tested only the larger stain and it was not conclusively semen. He admitted the stain, whatever it was, did match petitioner's DNA.

**4.** Deputy Johnson's contemporaneous notes also indicated saliva samples were taken at the hospital. Under cross-examination by the

it to Detective Baker who gave it to the evidence custodian, Doug Britton. Officer Lail picked up the kit from Britton and transported it to SLED for testing. The kit was still taped when Lail gave it to SLED agent McKay.

Inexplicably, when Agent McKay opened the kit, it contained only the two tubes of petitioner's blood and no saliva sample. McKay broke down the kit and put the tubes of blood in a heat-sealed pouch with an I.D. bar code on it and placed the pouch in a secure refrigerator.

SLED analyst Reinhart retrieved the sealed pouch from the refrigerator for preliminary testing. Reinhart was able to determine petitioner was a non-secretor [5] from his blood. The saliva sample was not needed.[6] Because petitioner's status as a non-secretor was consistent with the semen on the pillowcase, Reinhart forwarded the blood samples to SLED analyst Lambert for further analysis. Lambert made the DNA match.

Petitioner objected that the chain of custody for his blood sample, which provided the necessary evidence for the DNA match, was defective. He argued the fact that the kit did not contain a saliva sample when it was broken open by SLED agent McKay indicated a break in the chain of custody. The trial judge found there was nothing to indicate the integrity of the blood samples themselves had been compromised and admitted the evidence.

The Court of Appeals held the issue of the missing saliva sample went to the weight of the evidence and not its admissibility since the State established a continuous chain of custody.[7]

---

Solicitor, however, Deputy Johnson capitulated and stated he did not remember whether saliva was taken or not.

**5.** An individual's status as a non-secretor means blood type cannot be determined from other bodily fluids.

**6.** Saliva samples are used as a back-up only if it is not possible to determine secretor status from the subject's blood.

**7.** The Court of Appeals further held there was no evidence the "independently sealed" blood samples were compromised. We find no evidence in the record indicating the tubes of blood were independently sealed. Both Dr. Proctor and the technician who actually drew the

## ISSUE

Did the State prove a sufficient chain of custody for the admission of petitioner's blood sample?

## DISCUSSION

 The State must prove a chain of custody for a blood sample from the time it is drawn until it is tested. *State v. Smith,* 326 S.C. 39, 482 S.E.2d 777 (1997). A complete chain of evidence must be established as far as practicable, tracing possession from the time the specimen is taken from the human body to the final custodian by whom it is analyzed. *State v. Cribb,* 310 S.C. 518, 426 S.E.2d 306 (1992); *Raino v. Goodyear Tire and Rubber Co.,* 309 S.C. 255, 422 S.E.2d 98 (1992); *State v. Kahan,* 268 S.C. 240, 233 S.E.2d 293 (1977) (*citing Benton v. Pellum,* 232 S.C. 26, 100 S.E.2d 534 (1957)). Proof of chain of custody need not negate all possibility of tampering so long as the chain of possession is complete. *State v. Williams,* 301 S.C. 369, 392 S.E.2d 181 (1990).

 In applying this rule, we have found evidence inadmissible only where there is a missing link in the chain of possession because the identity of those who handled the blood was not established at least as far as practicable. *See State v. Cribb, supra; Raino v. Goodyear, supra; State v. Williams, supra; Benton v. Pellum, supra; see also State v. Joseph,* 328 S.C. 352, 491 S.E.2d 275 (Ct.App.1997). On the other hand, where the identity of persons handling the specimen is established, we have found evidence regarding its care goes only to the weight of the specimen as credible evidence. *See, e.g., State v. Smith, supra* (storage of blood in arresting officer's home). In other words, where there is a weak link in the chain of custody, as opposed to a missing link, the question is only one of credibility and not admissibility. *See Ex parte: Williams,* 548 So.2d 518 (Ala.1989); *State v. Stevenson,* 136 N.C.App. 235, 523 S.E.2d 734 (1999).

 Applying this rule to the case at hand, we find no missing link in the chain of custody. Since all custodians of the blood testified, petitioner had the opportunity to cross-

blood testified only that the tubes were labeled and placed in the kit and the entire kit was then sealed.

examine each of them regarding care of the blood. Each custodian testified he or she did not alter the evidence in any way and that the security tape was unbroken. The evidence that a saliva sample was placed in the kit simply contradicts the State's evidence negating tampering, thereby creating a factual issue. In sum, we find the evidence of a discrepancy in the contents of the kit does not render the blood sample inadmissible but goes only to its weight as credible evidence.[8]

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.

---

**8.** At oral argument before this Court, counsel argued the absence of the saliva sample was circumstantial evidence that SLED agents planted petitioner's saliva on the pillowcase as part of the mixed semen and saliva stain and then matched it to the DNA from his blood sample. See footnote 4, *supra*. While we find this novel argument intriguing, we note the presence of *two* stains on the pillowcase, one of which was clearly identified as semen and which matched petitioner's DNA *in addition to* the DNA found in the mixed semen and saliva stain. In any event, counsel's argument goes only to the weight of the pillowcase stains as evidence and not the admissibility of the blood sample.