597 S.E.2d 872

**The STATE, Respondent,**

v.

**Aaron MATHIS, Appellant.**

No. 3806.

Court of Appeals of South Carolina.

Heard May 12, 2004.
Decided June 1, 2004.

---

Acting Chief Attorney Joseph L. Savitz, III, and Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, and Assistant Attorney General W. Rutledge Martin, all of Columbia; and Solicitor Warren B. Giese, of Columbia, for Respondent.

ANDERSON, J.:

Aaron Mathis was convicted of attempted criminal sexual conduct in the second degree with a minor and incest. The trial judge sentenced him to life imprisonment without parole for the criminal sexual conduct charge and ten years, concurrent, for the incest charge. Mathis appeals his convictions, contending: (1) his prosecution was barred by the Double Jeopardy Clause of the United States and South Carolina Constitutions; (2) the trial judge erred by admitting evidence of Mathis's prior bad acts; and (3) the trial judge erred by admitting certain DNA evidence. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This action arises out of allegations that Mathis sexually abused his fourteen-year-old niece (the victim). In September of 2000, the victim and her mother traveled from their home in Durham, North Carolina, to spend the Labor Day weekend at the victim's grandmother's house in Columbia. On Labor Day afternoon, they had a cookout for family and friends in the area. Mathis arrived at the house later in the evening.

The victim testified Mathis made several inappropriate advances on her that night. On one occasion, shortly after Mathis arrived, he grabbed the victim and propositioned her for sex. He offered her money, saying "I'm going to give you the money for those boots [you want]." Mathis assured the victim that she had "nothing to worry about" because he had a condom, so he would not get her pregnant. This advance was forestalled, however, when one of the victim's aunts entered the room where Mathis had approached the victim.

Later that evening, the victim fell asleep while she was watching television alone in one of the bedrooms. The victim declared Mathis assaulted her while she was sleeping: "I woke up because I felt [Mathis] was in the room. He was in the room, and I felt him trying to insert his penis in me, so I woke up.... [I]t hurt real bad." Mathis left the house around 4:00 a.m. The victim returned to North Carolina without telling anyone in her family what occurred.

In January, the victim discovered she was pregnant. When her mother asked how it happened, the victim told her about the September 2000 incident with Mathis. The victim and her mother immediately traveled to Columbia and reported the conduct to the Richland County Sheriff's Department. Mathis was subsequently arrested and charged with incest and attempted criminal sexual conduct in the second degree with a minor.

### Serological and DNA Evidence Collected

After reporting the conduct to the Sheriff's Department, the victim and her mother traveled to Atlanta, Georgia, to have an abortion performed. As is required procedure in cases of alleged rape, an investigator employed by the Sheriff's Department was present at the abortion clinic to take fetal tissue samples and blood samples for use as evidence in the investigation. The Sheriff's Department investigator testified he received the fetal tissue and two vials of blood. The investigator was not present when the blood was drawn, but he was informed by the clinic staff that one vial contained the victim's blood and the other vial contained blood drawn from the umbilical cord. The investigator further stated he packaged the fetal tissue and blood samples and delivered them to an

evidence technician at the State Law Enforcement Division (SLED) headquarters in Columbia.

Thereafter, Special Agent Steve Lambert, a DNA analyst and serologist assigned to the forensic laboratory at SLED, transferred Mathis's blood from its vial to sterile cotton cloth so that it could be properly frozen and stored for later analysis. Lambert subsequently packaged the victim's blood sample, Mathis's blood sample, and the fetal tissue in separate heat-sealed pouches and placed them in a Styrofoam container. He sent the package by Federal Express to a laboratory in Dallas, Texas, for DNA analysis.

Amber Moss, a forensic scientist at the Dallas laboratory, professed she received an unopened, sealed package from Steve Lambert at SLED containing blood samples from the victim and Mathis and the fetal tissue. Moss reported:

> My results were that Aaron Mathis could not be excluded as the biological father of the fetal sample. The probability of paternity is ninety-nine point ninety-nine percent, as compared to an untested random number of the ... North American population.... Aaron Mathis is 1,252,078 times more likely to be the father of the fetal sample as a random tested individual.

At trial, the State introduced evidence of the DNA test results. The Solicitor, however, was unable to show a complete chain of custody for the blood samples taken from the victim at the Atlanta abortion clinic because no witness could testify regarding who actually drew the blood samples. Mathis moved for a mistrial, which the trial court granted. The case was retried the following month over Mathis's objection that retrial was barred under the Double Jeopardy Clause of the United States and South Carolina Constitutions. At the second trial, the State presented evidence of the identity of the person who drew the victim's blood at the abortion clinic, thus curing the defect that resulted in the initial mistrial.

### Prior Attempted Sexual Conduct

The victim testified that Labor Day 2000 was not the first time Mathis attempted to sexually assault her. She claimed it happened on three previous occasions. The first incident occurred in November of 1999 after a Thanksgiving family

gathering at her aunt's home in Mauldin, South Carolina. According to the victim, Mathis began rubbing the back of her thighs while she was watching television. He continued harassing the victim after the rest of the family went to bed—including trying to unbutton her pants, grabbing her hand and trying to put it into his pants, and continuing to rub her inappropriately. The victim declared Mathis attempted to cajole her acquiescence to his advances by offering to pay for a pair of boots she wanted for Christmas.

The second incident occurred on approximately January 16, 2000, again at the home of the victim's aunt in Mauldin. The victim stated she was lying on a bed alone in her cousin's bedroom. Mathis physically approached the victim and "started grinding on [her] from behind, like rubbing his penis up against [her] butt." As before, Mathis promised to give the victim money to purchase boots she wanted and offered her some jewelry he was wearing.

The third incident occurred around Easter weekend in April of 2000, at a family cookout at the victim's great-grandmother's home in Greenwood, South Carolina. Similar to the two prior incidents, the victim claimed Mathis grabbed her and started "grinding" on her and touched her inappropriately. According to the victim, Mathis's advances became more severe than before:

> He came and he got on top of me, and he was like touching me and stuff. And he was trying to pull my pants down again, but I grabbed them. . . . And he started like touching me with his finger. . . . In my vagina. And he was like, "Well, I've got to get me some of this." And he said, "You let other boys have some. Why can't I have some, too?" And he was like touching me, and he pulled his pants down. And he was like trying to have sex with me, but my pants, they were like around my they were at my knees, so he couldn't get close enough to me.

The victim was ultimately able to push Mathis away before anything further happened. This incident in April of 2000 was the last time the victim saw Mathis before the conduct on Labor Day of 2000, which is the basis of the current proceeding.

At trial, Mathis objected to the admission of the testimony regarding the allegations of these uncharged prior bad acts as being unfairly prejudicial and prohibited under *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923), and Rule 404(b), SCRE, which prohibits the admission of evidence of prior bad acts to prove the character of a person in order to show action in conformity therewith. The trial court allowed the testimony under the exception to that rule for evidence of prior bad acts that tends to establish a common scheme or plan.

## *LAW/ANALYSIS*

### I. Double Jeopardy

■ Mathis argues the Circuit Court erred when it allowed the second trial to proceed because the State's failure at the first trial to present a witness to establish the chain of custody for the victim's blood samples was intended to provoke the defense into moving for a mistrial, and therefore, the second trial was barred by the Double Jeopardy Clause. We disagree.

■ The Double Jeopardy Clauses of the United States and South Carolina Constitutions protect citizens from being placed twice in jeopardy of life or liberty. *See* U.S. Const. amend. V ("No person shall be ... subject for the same offence to be twice put in jeopardy of life or limb...."); S.C. Const. art. I, § 12 ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty ...."); *see also State v. Cuccia,* 353 S.C. 430, 434, 578 S.E.2d 45, 47 (Ct.App.2003) ("Both the United States Constitution and the South Carolina Constitution protect against double jeopardy."). The guarantee against double jeopardy has been said to consist of three separate constitutional protections. *Cuccia,* 353 S.C. at 434, 578 S.E.2d at 47. Under the Double Jeopardy Clause, a defendant is protected from (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple prosecution for the same offense after an improvidently granted mistrial. *State v. Gordon,* 356 S.C. 143, 588 S.E.2d 105 (2003); *State v. Kirby,* 269 S.C. 25, 236 S.E.2d 33 (1977); *see also United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) ("The Double Jeopardy Clause of the Fifth

Amendment protects a criminal defendant from repeated prosecutions for the same offense.") (footnote omitted). Generally, jeopardy attaches when the jury is sworn and impaneled, unless the defendant consents to the jury's discharge before it reaches a verdict or legal necessity mandates the jury's discharge. *State v. Baum,* 355 S.C. 209, 584 S.E.2d 419 (Ct.App. 2003), *petition for cert. filed; State v. Rowlands,* 343 S.C. 454, 539 S.E.2d 717 (Ct.App.2000).

Mathis cites *State v. Rowlands* and *State v. Baum* in regard to the applicability of the Double Jeopardy Clause after an improvidently granted mistrial. *Rowlands* and *Baum* are factually and legally inapposite to the case *sub judice.* The gravamen of *Rowlands* and *Baum* is the improvident grant of a mistrial; whereas, here, the court justifiably granted a mistrial on motion emanating from the defendant.

Mathis claims that, although a defendant's motion for mistrial ordinarily removes any barrier to a retrial, the Solicitor's conduct in the present case falls within the exception defined by the United States Supreme Court in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In *Kennedy,* the defendant in a state court criminal case moved for and received a mistrial because of improper prosecutorial questioning of an expert witness. *Id.* at 669, 102 S.Ct. 2083. When the State attempted to retry him, the defendant moved to dismiss the charges on double jeopardy grounds. The trial court found as a fact that " 'it was not the intention of the prosecutor in this case to cause a mistrial.' " *Id.* On the basis of this finding, the trial court held that double jeopardy principles did not bar retrial, and Kennedy was then tried and convicted. *Id.* at 670, 102 S.Ct. 2083.

The Oregon Court of Appeals decided the Double Jeopardy Clause barred Kennedy's retrial after his first trial ended in a mistrial granted on his own motion. *Id.* at 669, 102 S.Ct. 2083. The Court of Appeals concluded that retrial was barred because the prosecutorial misconduct that occasioned the mistrial in the first instance amounted to " 'overreaching.' " *Id.* The United States Supreme Court reversed, declaring that prosecutorial misconduct or harassment adequate to warrant a mistrial on defendant's motion is not by itself sufficient to

raise the bar of double jeopardy. *Id.* at 675–76, 102 S.Ct. 2083.

The Supreme Court inculcated:

Our cases ... have indicated that even where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial.....

Since one of the principal threads making up the protection embodied in the Double Jeopardy Clause is the right of the defendant to have his trial completed before the first jury impaneled to try him, it may be wondered as a matter of original inquiry why the defendant's election to terminate the first trial by his own motion should not be deemed a renunciation of that right for all purposes. We have recognized, however, that there would be great difficulty in applying such a rule where the prosecutor's actions giving rise to the motion for mistrial were done "in order to goad the [defendant] into requesting a mistrial." ... In *United States v. Dinitz,* [424 U.S.] at 611, 96 S.Ct. 1075, 47 L.Ed.2d 267 [ (1976) ], we said:

"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions."

. . . .

Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of

double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

. . . .

We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

*Id.* at 673–79, 102 S.Ct. 2083 (citations omitted and footnote omitted).

Thus, the *Kennedy* Court adopted a rule providing that a defendant who has moved for and been granted a mistrial may successfully invoke the Double Jeopardy Clause to prevent a second prosecution only when the prosecutor's conduct giving rise to the mistrial was intended to "goad" or provoke him into moving for the mistrial. *Id.* at 673, 102 S.Ct. 2083. Under this standard, the determination depends upon whether prosecutorial misconduct was undertaken with the specific intent "to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 676, 102 S.Ct. 2083; *see also Gilliam v. Foster,* 75 F.3d 881 (4th Cir.1996) (stating that when defendant seeks or consents to grant of mistrial, there is no bar to his later retrial; this proposition is subject to an exception when defendant establishes his request for mistrial was motivated by prosecutorial or judicial misconduct that was intended to provoke defendant into moving for a mistrial).

"*Kennedy* emphasized that intent to provoke a mistrial, rather than mere prosecutorial overreaching, is necessary to render meaningless a defendant's motion for a mistrial." *United States v. Johnson,* 55 F.3d 976, 978 (4th Cir.1995). A "court's finding concerning the prosecutor's intent is . . . a factual one which we must accept unless it is clearly erroneous." *United States v. Borromeo,* 954 F.2d 245, 247 (4th Cir.1992); *see also United States v. Council,* 973 F.2d 251, 254 (4th Cir.1992) ("Deference should be given to the trial court in determining whether such an intent existed."); *United States*

*v. Wentz,* 800 F.2d 1325, 1327 (4th Cir.1986) (noting the question of prosecutorial provocation is one of fact on which the findings of the trial court may not be set aside unless clearly erroneous).

Under the rule outlined in *Kennedy,* the instant case implicates no double jeopardy concerns. This Court does *NOT* condone in any way the Solicitor's failure to diligently prepare the State's case against the accused by reviewing the evidence in advance of trial to ensure a proper foundation was laid for all the evidence it planned to present. This Court has concernment in regard to the sloppy preparation by the State in reference to the chain of custody rule. We admonish Solicitors in South Carolina to respond with vivacity in the preparation and presentation of the State's case. We are not happy with the factual scenario encapsulated in this case involving the conduct of the litigation by the Solicitor.

The Solicitor's neglect did *NOT* rise to the level of "goading" or "provoking" Mathis to move for a mistrial. The evidentiary record does *NOT* reveal any specific intent on the part of the Solicitor "to subvert the protections afforded by the Double Jeopardy Clause." The trial judge ruled: "I've pondered this from the standpoint of trying to determine whether or not this would be prosecutorial misconduct. I don't think it rises to that level.... [I]t was nothing intentional on their part." The record is devoid of any evidence of intent by the State to withhold evidence establishing the chain of custody or otherwise prompt the mistrial. Accordingly, although the Solicitor failed to properly prepare the case by establishing a complete chain of custody for the blood evidence, the trial court correctly ruled the retrial was not barred.

## II. Evidence of Prior Misconduct

■ Mathis maintains the trial court erred in admitting evidence of uncharged sexual misconduct allegedly committed by Mathis on the victim three times prior to the Labor Day 2000 incident for which he was tried. He asserts the evidence does not fall within any of the exceptions to the general ban on evidence of an accused's other bad acts. We disagree.

Generally, South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged. *State v. Pagan*, 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004); *see also State v. Beck*, 342 S.C. 129, 536 S.E.2d 679 (2000) (finding that evidence of prior crimes or bad acts is inadmissible to prove bad character of defendant or that he acted in conformity therewith). Such evidence is admissible, however, when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5) the identity of the person charged with the present crime. Rule 404(b), SCRE; *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923); *see also Anderson v. State*, 354 S.C. 431, 581 S.E.2d 834 (2003) (explaining that Rule 404, the modern expression of the *Lyle* rule, excludes evidence of other crimes, wrongs, or acts offered to prove character of person in order to show action in conformity therewith; the rule creates an exception when testimony is offered to show motive, identity, existence of common scheme or plan, absence of mistake or accident, or intent).

If not the subject of a conviction, a prior bad act must first be established by clear and convincing evidence. *Beck*, 342 S.C. at 135, 536 S.E.2d at 683. The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused. *State v. Braxton*, 343 S.C. 629, 541 S.E.2d 833 (2001). The decision to admit contested evidence is entrusted to the sound discretion of the trial judge. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001). "If there is any evidence to support the admission of the bad act evidence, the trial judge's ruling will not be disturbed on appeal." *Id.* at 6, 545 S.E.2d at 829.

In the present case, the trial judge admitted the evidence of Mathis's prior alleged sexual misconduct under the common scheme or plan exception to Rule 404(b), SCRE, and *Lyle*. "A close degree of similarity or connection between the prior bad act and the crime for which the defendant is on trial is required to support admissibility under the common scheme or plan exception." *State v. Cheeseboro*, 346 S.C. 526, 546, 552 S.E.2d 300, 311 (2001). The connection between the prior bad

act and the crime must be more than just a general similarity. *State v. Timmons*, 327 S.C. 48, 488 S.E.2d 323 (1997). "A common scheme or plan concerns more than the commission of two similar crimes; some connection between the crimes is necessary." *Id.* at 52, 488 S.E.2d at 325; *see also State v. Ford*, 334 S.C. 444, 513 S.E.2d 385 (Ct.App.1999) (stating that the common scheme or plan exception requires not just similarity of the other acts to the crime charged, but also a close relationship between the crimes); *State v. Moultrie*, 316 S.C. 547, 554, 451 S.E.2d 34, 39 (Ct.App.1994) ("Clear and convincing evidence of prior crimes or bad acts that is logically relevant is ... admissible to prove ... a common scheme or plan that embraces several previous crimes so closely related to each other that proof of one tends to establish the other.").

▆▆▆ In deciding whether to admit evidence of prior bad acts, courts must weigh the probative value of evidence of prior bad acts against its prejudicial effect. *State v. McClellan*, 283 S.C. 389, 323 S.E.2d 772 (1984). Where the evidence of the bad acts is so similar to the charged offense that the previous act enhances the probative value of the evidence so as to outweigh its prejudicial effect, it is admissible. *State v. Weaverling*, 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999). However, even if the evidence is clear and convincing and falls within a *Lyle* exception, the trial judge must exclude it if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* Thus, "[s]uch evidence is inadmissible 'unless the close similarity of the charged offense and the previous act[s] enhances the probative value of the evidence so as to overrule the prejudicial effect.'" *McClellan*, 283 S.C. at 392, 323 S.E.2d at 774.

In *State v. Weaverling*, this Court applied the common scheme or plan exception in a case involving allegations of criminal sexual conduct. *Id.* at 471, 523 S.E.2d at 792–93. In that case, the Court found "[t]he common scheme or plan exception 'is generally applied in cases involving sexual crimes, where evidence of acts prior and subsequent to the act charged in the indictment is held admissible as tending to show *continued illicit intercourse* between the same parties.'" *Id.* at 469, 523 S.E.2d at 791 (quoting *State v. Whitener*, 228 S.C. 244, 265, 89 S.E.2d 701, 711 (1955)) (emphasis added). In *Weaverling*, the defendant allegedly sexually abused the same

victim in the same manner almost every time the two were together for a period of five or six years. The victim testified that he had been assaulted by the defendant in excess of one hundred times. We held the defendant's pattern of continuous sexual abuse satisfied the common scheme or plan exception. *Id.* at 471, 523 S.E.2d at 792–93.

*State v. Tutton,* 354 S.C. 319, 580 S.E.2d 186 (Ct.App.2003), explicates that cases involving criminal sexual conduct often entail the admission of past conduct evidence to show a common scheme or plan:

> We interpret [*State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999) and *State v. McClellan,* 283 S.C. 389, 323 S.E.2d 772 (1984) ] to suggest that common scheme or plan evidence in criminal sexual conduct cases will be admitted on a generalized basis only where there is a pattern of continuous illicit conduct. Sex crimes may be unique in this respect because they commonly involve the same victims engaged in repeated incidents occurring under very similar circumstances. The reason for the general admissibility of such evidence under these circumstances is self evident—where there is a pattern of continuous conduct shown, that pattern clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion.

*Id.* at 328, 580 S.E.2d at 191.

In the present case, the evidence of the alleged prior bad acts reveals a close degree of similarity to the facts of the crime charged. The evidence demonstrates by clear and convincing proof the occurrence of the prior bad acts. The three earlier assaults on the victim were all attempted in the same manner and under similar circumstances. On each occasion, Mathis approached the victim while she was alone at family gatherings. He would touch her in largely the same suggestive, inappropriate manner each time, and he would then attempt to entice her to have sex with him. During at least two of the three prior incidents, Mathis accompanied his improper advances with offers of gifts—just as he did during the incident for which he was charged. Overall, the three prior incidents of sexual misconduct by Mathis show the same

illicit conduct with the victim over the course of the nine months prior to September 2000. Concomitantly, we conclude the probative value of the evidence regarding Mathis's prior bad acts clearly outweighs the prejudicial effect of admitting the evidence.

## III. Admissibility of DNA Evidence

Mathis contends the trial court erred by admitting evidence of the DNA test results prepared by the testing laboratory in Dallas, Texas, because the chain of custody for the blood samples and fetal tissue was not properly established. Specifically, Mathis argues the chain is incomplete because the whereabouts of the vial of blood taken from the umbilical cord are unknown. Amber Moss, a forensic scientist at the Dallas laboratory, testified she received only the fetal tissue and blood stains from the victim and Mathis.

Our Supreme Court addressed the chain of custody rule in *State v. Carter,* 344 S.C. 419, 544 S.E.2d 835 (2001). In that case, blood and saliva samples were collected from the defendant for testing. The samples were placed in a sealed container. After being handled by several people, the container was opened by a SLED agent, who found the saliva sample was missing. The defendant objected that the chain of custody for his blood sample, which provided the necessary evidence for the DNA match, was defective. He claimed the fact that the kit did not contain a saliva sample when it was broken open by the SLED agent indicated a break in the chain of custody. The trial judge found there was nothing to indicate the integrity of the blood samples themselves had been compromised and admitted the evidence.

The Supreme Court articulated:

The State must prove a chain of custody for a blood sample from the time it is drawn until it is tested. *State v. Smith,* 326 S.C. 39, 482 S.E.2d 777 (1997). A complete chain of evidence must be established as far as practicable, tracing possession from the time the specimen is taken from the human body to the final custodian by whom it is analyzed. *State v. Cribb,* 310 S.C. 518, 426 S.E.2d 306 (1992); *Raino v. Goodyear Tire and Rubber Co.,* 309 S.C. 255, 422 S.E.2d 98 (1992); *State v. Kahan,* 268 S.C. 240, 233

S.E.2d 293 (1977) (citing *Benton v. Pellum,* 232 S.C. 26, 100 S.E.2d 534 (1957)).  Proof of chain of custody need not negate all possibility of tampering so long as the chain of possession is complete.  *State v. Williams,* 301 S.C. 369, 392 S.E.2d 181 (1990).

*Id.* at 424, 544 S.E.2d at 837.  The Court discussed the application of the chain of custody rule:

In applying this rule, we have found evidence inadmissible only where there is a missing link in the chain of possession because the identity of those who handled the blood was not established at least as far as practicable.  **On the other hand, where the identity of persons handling the specimen is established, we have found evidence regarding its care goes only to the weight of the specimen as credible evidence.  In other words, where there is a weak link in the chain of custody, as opposed to a missing link, the question is only one of credibility and not admissibility.**

*Id.* at 424, 544 S.E.2d at 837 (emphasis added and citations omitted).

The *Carter* Court found no missing link in the chain of custody.  The Court concluded "the evidence of a discrepancy in the contents of the kit does not render the blood sample inadmissible but goes only to its weight as credible evidence."  *Id.* at 425, 544 S.E.2d at 838.

In the retrial of the case at bar, the identity of all persons handling the blood samples was clearly established.  As in *Carter,* the State proved a continuous chain of custody through the testimony of all people who had control and possession of the evidence.  The persons who handled the evidence testified at trial.

There is no missing link in the chain of custody.  The discrepancy in this case only involves a weak link and raises a question of credibility, not admissibility.  The trial judge did not err in admitting evidence of the DNA test results.

## CONCLUSION

We hold Mathis's second trial was not barred under the principle of double jeopardy.  Evidence of Mathis's prior bad

acts and the DNA evidence were properly admitted. The rulings of the Circuit Court are

**AFFIRMED.**

HUFF and KITTREDGE, JJ., concur.