605 S.E.2d 19

**The STATE, Respondent,**

v.

**Bobby Lee HOLMES, Appellant.**

No. 25886.

Supreme Court of South Carolina.

Heard Feb. 19, 2004.

Decided Nov. 1, 2004.

Rehearing Denied Dec. 1, 2004.

334

Senior Assistant Appellate Defender Wanda Haile, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; and Thomas E. Pope, of York, for respondent.

Justice MOORE:

Appellant was convicted [1] of murder, first degree burglary, first degree criminal sexual conduct (CSC), and robbery. He received a death sentence for the murder, the jury having found three statutory aggravating circumstances,[2] and received three concurrent sentences for the other offenses.[3] Appellant alleges errors occurred in both the guilt phase and

---

1. This was appellant's second capital trial. His direct appeal from the first trial was affirmed, *State v. Holmes*, 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied*, 517 U.S. 1248, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996); appellant was subsequently granted a new trial on post-conviction relief.

2. The aggravating circumstances were murder during the commission of burglary, murder during the commission of CSC, and physical torture.

3. The imprisonment terms were life for burglary; thirty years for CSC; and fifteen years for robbery.

the sentencing phase of his trial. We affirm appellant's convictions and sentences.

## FACTS

At approximately 6:15 a.m. on December 31, 1989, the eighty-six-year-old victim opened her door in response to someone's knocking. A black male forced his way into her apartment, beat her about the chest and head, and demanded money. The man forced the victim into her bedroom where he ripped off her nightgown and anally raped her. He took $40 from her purse and left the apartment after ripping the living room phone from the wall.

At 7:45 a.m., the victim's friend (Mrs. Thrasher) phoned to check on the victim. After six or seven rings, the victim answered and told Mrs. Thrasher she had been beaten, anally raped, and robbed. Mrs. Thrasher called another friend, Mrs. Byers, who had an automobile and a key to the victim's apartment. Mrs. Byers went to the apartment, noticed it was messy, spoke with the victim who told her the assailant was "big and dark," and then drove to the police department since the living room phone had been pulled off the wall.[4]

The first officer on the scene was Dale Edwards. The victim told him that around 6 or 6:30 a.m. she heard knocking at her front door and that when she opened the door, a black male forced his way in. She had taken a shower before the police arrived. Officer Edwards removed the sheets and pillowcase from the bed for use as evidence, and placed the items in a paper grocery bag taken from the victim's kitchen. Lt. Barnett arrived and assisted in the evidence collection. A pink nightgown, a housecoat, and a rag were removed from the bathroom and placed in another grocery bag. The victim gave Officer Edwards a pink paper towel with blood on it that he placed in a manila envelope brought to the scene by Captain Mobley, the third officer on the scene.

While the three police officers were there, two paramedics arrived to transport the victim to a local hospital emergency room. Blood samples were taken, but a rape kit was not

---

4. The victim apparently answered Mrs. Thrasher's call using her bedroom phone.

processed because the victim was complaining of hip pain and medical personnel were awaiting X-rays before performing the exam. The blood testing kit used to take samples from the victim had "expired" several months earlier.[5] Before the victim's mental state began to deteriorate, she described her attacker to an emergency room nurse as a black male in his late twenties. On February 19, 1990, the victim was transferred to a nursing home where she died in March. The cause of death was pneumonia, which developed as the consequence of her severe brain injury.

Captain Mobley testified he arrived at the victim's apartment as the EMS personnel were transporting her out the door. He took custody of the evidentiary items from Officer Edwards and Lt. Barnett. He sent Officer Edwards door to door in the neighborhood and instructed Lt. Barnett to go to the hospital and speak with the victim.

Lt. Barnett recorded the victim's statement at the hospital emergency room before she became confused. She described her attacker's clothing: "a dark jacket, must have been blue or black, must have been black;" "a pair of those funny looking pants ... not the old pant, but something that's kind of mixed up you know;" his hair: "kind of long. Not too long, but a little longer than you usually wear it;" she then said: "he was middle aged. He was young. He was not too young. And he, as I remember, his hair was not short or not too long." The victim described her attacker as dark skinned, "not too heavy. Not too slim."

Later that day, Officer Edwards talked to several of the victim's neighbors. Ms. Boyd told him she heard knocking at her door about 3 a.m.; Mr. Lynn, who lived next door to the victim, reported knocking between 5:30 a.m. and 6:30 a.m.; and Ms. Diggs, who lived on the other side of the victim, heard someone knocking on her door around 6 or 6:30 a.m.

Officer Grady Harper testified he was dispatched to an apartment complex near the victim's residence at about 4:43

---

**5.** Appellant includes the use of an expired kit in his argument that the forensic evidence was compromised. There was evidence, however, that the expiration date is a manufacturer's "guess" as to how long the vacuum in the blood collection vials will remain good, and that the kit can be used after that date if the vacuum remains effective.

a.m. on December 31, 1989. A number of people, including appellant, were making a disturbance, and Officer Harper told them to quiet down and move on. Appellant was unruly, and Officer Harper called for back-up to assist in arresting appellant. When the additional officers arrived, appellant ran. Officer Harper saw appellant get into a car; Officer Harper gave chase in his patrol car. The driver stopped the car and appellant ran from it. The last time Officer Harper saw appellant was about 5:30 a.m. and the other officers were chasing appellant. One of the "chasing" officers testified he lost sight of appellant at about 5:20 a.m. Appellant was wearing a black sweater with a hood and blue jeans.

Captain Mobley testified that after Officer Edwards and Lt. Barnett left the victim's apartment; he locked the front door and began processing the scene. He seized one more paper towel, the telephone touched by the assailant, and the victim's purse. He then dusted the apartment for fingerprints. On the interior side of the front door he photographed and lifted a palm print located slightly above the doorknob. Captain Mobley also photographed and lifted a print from the outside of the front door. The inside palm print was later identified as that of appellant.

Appellant was arrested on the afternoon of December 31, 1989, at his father's home in York, and denied ever having been inside the victim's apartment. When the police arrived, appellant was wearing a black hooded sweatshirt, underwear, and socks. He dressed in jeans before being transported by the police. While he was dressing, Officer Boot Smith noticed a tank top that appeared to have blood on it and asked if the police officers could take it. Appellant consented and stated the blood came from a fight he had been involved in the night before at a bar.

Forensic evidence linked appellant to the crime scene. In addition to the palm print found on the victim's door, the State introduced evidence that:

(1) fibers consistent with a black sweatshirt owned by appellant were found on the victim's bed sheets;

(2) a blue acrylic fiber was found on the victim's pink nightgown, and another on appellant's blue jeans: they "could have come from the same common source or it could

have come from different sources, but indeed they do ... match each other;"

(3) microscopically consistent fibers were found on the pink nightgown and, in the form of a "fiber pill," on appellant's underwear;

(4) appellant's underwear contained a mixture of DNA from two individuals and 99.99% of the population other than appellant and the victim were excluded as contributors to that mixture; and

(5) appellant's tank top was found to contain a mixture of his blood and the victim's blood.

The defense theory was two-fold. First, it sought to discredit the forensic evidence by showing the evidence was mishandled and by demonstrating the many opportunities for contamination because of unprofessional errors. The defense also sought to suggest that the alleged contamination was not merely the result of simple negligence, but part of a plot on the part of certain law enforcement officers to see that appellant was convicted of these crimes. In connection with this prong of the defense strategy, appellant sought to introduce evidence of third party guilt.

## ISSUE

Whether the circuit court erred by refusing to admit evidence of third party guilt?

## DISCUSSION

At a pretrial hearing, appellant proffered evidence of third party guilt. Specifically, he sought to introduce evidence at trial that the crimes were actually committed by Jimmy McCaw White (Jimmy).

### 1. *Pre-trial testimony*

Like appellant, Jimmy is a black male. At the time of the victim's murder, he was twenty-two years old; appellant was eighteen. Jimmy's hair was longer than appellant's and Jimmy had lighter skin than appellant.

Several witnesses placed Jimmy in the victim's neighborhood near 6 a.m. on December 31, 1989. Frenetta Johnson

testified she saw Jimmy going toward the apartments where the victim lived between 4:30 and 5:30 a.m. Later in her testimony, she narrowed the time to "from four-thirty to something to five." Meshelley Gilmore testified she observed Jimmy in an apartment parking lot as she drove away from her home at about 3:30 or 4 a.m., and that he was still there when she returned at 4:30–4:45 a.m. These apartments were near the victim's complex. Mrs. Gilmore was awakened by a police officer knocking on her door at 7:30 a.m. She told him she had seen Jimmy hanging around the parking lot earlier that morning.

Deloris Brown testified she saw Jimmy walking down the victim's street in the direction of the victim's apartment between 4 and 5 a.m. on December 31, 1989. Eighty-seven-year-old Anna Boyd, a resident of the same apartment complex as the victim, testified that someone knocked on her door during the night of December 30–December 31. The knocker said, "Open the door, my man, this is Jimmy, open the door." These are appellant's "proximity" witnesses.

Appellant also presented several witnesses who testified that Jimmy had acknowledged that appellant was "innocent" or to whom Jimmy had admitted his guilt. Thomas Murray testified that Jimmy said he knew appellant was innocent, and that he (Jimmy) could not be brought to court for it. Ken Rhodes testified he asked Jimmy whether the word on the street, that Jimmy was the victim's murderer, was true and that Jimmy "put his head down and he raised his head back up and he said well, you know, I like older women .... and he never called the lady's name but you know he say that he liked old women and that yeah he did what they say he did and you know that somebody else was locked up for it. And you know it's like he didn't have no regrets about it at all." Rhodes went on to testify that "[Jimmy] didn't say exactly what he done, he just told me that she had some good stuff ... He said that he didn't kill the lady. The lady was alive when he left...."

Mattie Mae Scott testified that in October 1997 she was at her son's house when Jimmy came to visit. Jimmy was "partially intoxicated," and when the others began talking about the 'old lady in York' that Jimmy had raped and

murdered, Jimmy said, "Yes, I did it but [appellant] is going to fry for it."

The defense's "star witness" was Stephen Westbrook.[6] He testified that in 1990 and again in 1994 Jimmy told him he had broken into the victim's house and raped her. Jimmy told Westbrook that Officer Boot Smith[7] had told Jimmy to keep quiet about his guilt. Westbrook further testified that Officer Smith and Investigator Potts came to see Westbrook before appellant's first trial and offered to get him out of jail if he would testify that appellant had confessed to him. Westbrook testified that in June 2000, about two months before this pretrial hearing, he was brought to Rock Hill from Kirkland Correctional Institute. In Rock Hill, he was confronted by several employees of the solicitor's office who sought to convince him to testify against appellant in the upcoming second trial. Westbrook stated that the solicitor's office employees acknowledged to him that they had manufactured underwear evidence incriminating appellant. Westbrook also testified that Jimmy told him that Officer Smith was out to "frame" appellant, and that even appellant's former attorney had urged him to testify against appellant. Finally, Westbrook testified an employee of the solicitor's office stated that, in addition to the manufactured underwear evidence, they had lifted one of appellant's palm prints from the county jail door to use against him at trial. These are appellant's "confession" witnesses.

Further, the defense called a witness who testified that when asked why he would not confess, Jimmy told him "it's all over and done with and [appellant] is going to do the time for it."

The former receptionist at the York Public Defender's Office testified that Jimmy brought up the crime in conversation with her one day, and remarked that he did not believe appellant was guilty, that maybe Jimmy knew who did it, and that everybody on the street knew.

Finally, the defense called Jimmy to testify at the pretrial hearing. The trial judge instructed Jimmy he had the right to

---

6. Westbrook's credibility was called into question by cross-examination and by impeachment.

7. Boot Smith was deceased at the time of this trial.

remain silent and the right to an attorney, and warned Jimmy that anything he chose to say could be used against him. Jimmy declined the offer of an attorney and opted to testify. Jimmy testified he left York and was home in Sharon by 2 a.m. on December 31, 1989. He claimed to have ridden with Junior Lytle. Lytle, however, testified at the pretrial hearing and denied driving Jimmy home to Sharon that night. Jimmy denied telling Stephen Westbrook that he had raped and killed the victim and denied confessing in the presence of Thomas Murray or John Dixon or telling the York Public Defender's receptionist that he knew who killed the victim.

### 2. *Standard for admitting third party guilt*

We have held that a defendant seeking to present evidence of third party guilt must meet this standard:

[T]he evidence offered by accused as to the commission of the crime by another person must be limited to such facts as are inconsistent with his own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence; evidence which can have (no) other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

*State v. Gregory,* 198 S.C. 98, 104, 16 S.E.2d 532, 534 (1941) (citing 16 C.J. 560).

The *Gregory* court went on to cite from 20 Am. Jur. 254: But before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party. Remote acts, disconnected and outside the crime itself, cannot be separately proved for such a purpose. An orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial does not contemplate that such defendant be permitted, by way of defense, to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that someone other than he is more probably guilty.

*Id.,* 198 S.C. at 104–105, 16 S.E.2d at 535. Further, in *State v. Gay,* 343 S.C. 543, 541 S.E.2d 541 (2001), we held that where

there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence.

■■■■ Appellant fails to meet the standard set out in *Gregory* and *Gay* due to the strong evidence of his guilt. He simply cannot overcome the forensic evidence against him to raise a reasonable inference of his own innocence. This evidence included: (1) appellant's palm print was found just above the door knob on the interior side of the front door of the victim's house; (2) fibers consistent with a black sweatshirt owned by appellant were found on the victim's bed sheets; (3) matching blue fibers were found on the victim's pink nightgown and on appellant's blue jeans; (4) microscopically consistent fibers were found on the pink nightgown and on appellant's underwear; (5) appellant's underwear contained a mixture of DNA from two individuals, and 99.99% of the population other than appellant and the victim were excluded as contributors to that mixture; and (6) appellant's tank top was found to contain a mixture of appellant's blood and the victim's blood.[8]

Further, besides the forensic evidence, there was evidence that appellant matched the description of the perpetrator given by the victim and there was evidence that appellant was fleeing from police officers and was in the area of the victim's house prior to the time she was attacked.

Regarding appellant's claim that he should have been allowed to present evidence that Jimmy White may have been

---

8. Although appellant claims the forensic evidence was mishandled and therefore was inadmissible, the fact the forensic evidence may have been compromised by the unprofessional manner in which the evidence was collected goes to the weight of the evidence, not to its admissibility. *See State v. Carter*, 344 S.C. 419, 544 S.E.2d 835 (2001) (weak links in chain of custody go to weight, not admissibility); *State v. Smith*, 326 S.C. 39, 482 S.E.2d 777 (1997) (storage of blood sample in police officer's home goes to weight of evidence not its admissibility). In any event, appellant's claims do not eviscerate all of the forensic evidence. For example, appellant's claims do not eliminate the fact that consistent fibers were found on both his clothing and the victim's clothing and sheets or the fact that 99.99% of the population other than appellant and the victim were excluded as contributors to the mixture found in appellant's underwear.

the perpetrator of the crimes, the State proffered the testimony of a Federal Bureau of Investigations forensic examiner. This examiner testified that, after testing Jimmy White's specimen, *i.e.* a dried bloodstain, and comparing the specimen to the clothing items that were tested as part of the investigation, White was excluded.

Given the overwhelming evidence of appellant's guilt, the circuit court did not err by excluding the evidence of third party guilt.

## CONCLUSION

■ Appellant's remaining issues are without merit and we dispose of them pursuant to Rule 220(b), SCACR. *See Issue I: State v. Council,* 335 S.C. 1, 515 S.E.2d 508, *cert. denied,* 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999) (whether juror is qualified to serve on death penalty case is within discretion of trial court and is not reviewable on appeal unless wholly unsupported by the evidence; responses of challenged jurors must be examined in light of entire voir dire); *Issue IV: State v. Johnson,* 338 S.C. 114, 525 S.E.2d 519, *cert. denied,* 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) (appellate court will not disturb trial court's ruling concerning scope of cross-examination of a witness to test his or her credibility absent manifest abuse of discretion); *see also State v. Beckham,* 334 S.C. 302, 513 S.E.2d 606 (1999) (trial court erred by not admitting impeachment evidence after officer denied he had investigated two suspects different from the defendant; however, error found to be harmless); *Issue VI: State v. Humphries,* 325 S.C. 28, 479 S.E.2d 52 (1996), *cert. denied,* 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997) (contemporaneous objection required to preserve issue for appellate review); *Issues VII and VIII: State v. Hughes,* 336 S.C. 585, 521 S.E.2d 500 (1999), *cert. denied,* 529 U.S. 1025, 120 S.Ct. 1434, 146 L.Ed.2d 323 (2000) (capital defendant may present as mitigating evidence (1) any aspect of defendant's character or record and (2) any circumstances of the crime that may serve as a basis for a sentence less than death); *State v. Southerland,* 316 S.C. 377, 447 S.E.2d 862 (1994), *cert. denied,* 513 U.S. 1166, 115 S.Ct. 1136, 130 L.Ed.2d 1096 (1995)[9]

---

**9.** *Overruled on other grounds by State v. Chapman,* 317 S.C. 302, 454 S.E.2d 317 (1995).

(residual doubts are not a mitigating factor in sentencing); *Issue IX: Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (properly administered the business and public records exceptions are among the safest against a Confrontation Clause challenge of the hearsay exceptions); Rule 1006, SCRE (contents of voluminous records may be presented in form of a summary provided underlying data are admissible into evidence); *State v. Whipple*, 324 S.C. 43, 476 S.E.2d 683, *cert. denied*, 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 541 (1996) (prison disciplinary records admissible under Uniform Business Records as Evidence Act, S.C.Code Ann. § 19–5–510 (1985)); *Issue XI: Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (victim impact evidence is admissible in a capital sentencing proceeding); *Neill v. Gibson*, 278 F.3d 1044 (10th Cir.2001), *cert. denied*, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002) (no *ex post facto* violation in allowing victim impact evidence when crime occurred in 1984); *Issue XII: State v. Humphries*, 325 S.C. 28, 479 S.E.2d 52 (1996), *cert. denied*, 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997) (contemporaneous objection required to preserve issue for appellate review); *Issue XIII: State v. Stroman*, 281 S.C. 508, 316 S.E.2d 395 (1984) (party cannot complain of error which his own conduct has induced); *Issue XV: State v. Weik*, 356 S.C. 76, 587 S.E.2d 683 (2002), *cert. denied*, 539 U.S. 930, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003) (issues cannot be raised for the first time on appeal); *State v. Saltz*, 346 S.C. 114, 551 S.E.2d 240 (2001) (admission of evidence is in trial court's discretion and will not be disturbed on appeal absent an abuse of discretion).[10]

---

**10.** As for Issue XIV, appellant's argument is based upon a factual error. Appellant argues the trial court erred by permitting the State to cross-examine a social worker using records from his stay in Gilliam Psychiatric Hospital in 2000. However, the trial court in fact denied the State's request to cross-examine the social worker and the State did not ask any questions regarding the 2000 Gilliam records. Because the Record on Appeal does not support appellant's assertion, we do not address his argument. *See State v. Sinclair*, 275 S.C. 608, 274 S.E.2d 411 (1981) (where appellant obtained only relief he sought, this court has no issue to decide).

*Proportionality Review*

Under State law, S.C.Code Ann. § 16–3–25(C)(3) (1985) requires this Court to determine in a death case "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." There is no requirement the sentence be proportional to any particular case; however, death sentences have been imposed in similar cases. *See State v. Simmons*, 360 S.C. 33, 599 S.E.2d 448 (2004); *State v. Terry*, 339 S.C. 352, 529 S.E.2d 274, *cert. denied*, 531 U.S. 882, 121 S.Ct. 197, 148 L.Ed.2d 137 (2000); *State v. Council*, 335 S.C. 1, 515 S.E.2d 508, *cert. denied*, 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999); *State v. Whipple*, 324 S.C. 43, 476 S.E.2d 683, *cert denied*, 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 541 (1996). Accordingly, appellant's sentence is not disproportionate under State law. The judgment of the circuit court is

**AFFIRMED.**

TOAL, C.J., WALLER, J., and Acting Justice JOHN W. KITTREDGE, concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES, dissenting:

I respectfully dissent, and would find the circuit court erred in refusing to allow appellant to introduce evidence of third party guilt in the guilt phase of the trial. I would therefore reverse and remand for a new trial.

The majority and I agree on the third party guilt evidence proffered by appellant. In my view, the proffer met the standard established by *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941). The majority, relying on *State v. Gay*, 343 S.C. 543, 541 S.E.2d 541 (2001), concludes that the third party guilt evidence was properly excluded. I find *Gay* distinguishable.

In *Gay*, the Court affirmed the exclusion of evidence of third party guilt because the State's case, particularly the forensic evidence, was so strong that it admitted of no "reasonable inference" regarding the defendant's innocence. The

present case is distinguishable from *Gay* in several important particulars. First, the validity of the forensic evidence was not called into question in *Gay*. Here, appellant presented evidence of mishandling, for example the collection of evidence at the scene using grocery bags from the victim's kitchen, the mislabeling of samples at the lab, and the loss of all blood samples collected from the victim. Further, appellant proffered evidence that representatives of the State had admitted manufacturing blood and palm print evidence against him. Finally, unlike the defendant in *Gay*, appellant proffered both "proximity" witnesses and "confession" witnesses. Considering the record as a whole, the State's evidence was not sufficient to negate the "reasonable inference" of appellant's innocence arising from appellant's proffer.

I would reverse and remand for a new trial.