*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————————

RICHARD MILLER,

*Petitioner-Appellant,*

*v.*

No. 09-3151

TIMOTHY BRUNSMAN, Warden,

*Respondent-Appellee.*

————————————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00733—Michael R. Merz, Magistrate Judge.

Argued: March 3, 2010

Decided and Filed: March 24, 2010

Before: MARTIN, ROGERS, and McKEAGUE, Circuit Judges.

————————————————

## COUNSEL

**ARGUED:** Nicole Lynn Rutter-Hirth, RION, RION & RION, Dayton, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Jon Paul Rion, RION, RION & RION, Dayton, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court, in which McKEAGUE, J., joined. MARTIN, J. (pp. 15-17), delivered a separate concurring opinion.

————————————————

## OPINION

————————————————

ROGERS, Circuit Judge. Richard Wayne Miller, convicted by an Ohio jury of aggravated murder and aggravated robbery in connection with the March 2002 slaying of Paul Brown, appeals the denial of his petition for a writ of habeas corpus. Miller argues that the state courts violated his constitutional right to present a defense by excluding evidence

1

that a third party, Scottie Guenther, had robbed and killed Brown.  Because the evidence Miller proffered in support of his third-party perpetrator defense failed to show a sufficient nexus between Guenther and the Brown murder, and because the state courts' weighing of the probative value of the evidence against its tendency to confuse the issues or mislead the jury was a reasonable application of clearly established federal law, Miller is not entitled to the habeas relief he seeks.

## I.

The Court of Appeals of Ohio, on direct appeal, summarized the criminal case underlying this habeas petition:

> On March 27, 2002, the body of 33-year-old Paul Brown was discovered lying face down in Two Mile Creek behind an apartment complex in the city of Hamilton, Ohio.  Brown had been stabbed 14 times and his throat had been deeply slit from ear to ear.  His wallet was found some distance downstream, his front pants pockets had been turned out, and $7.07 was found in his rear pants pocket.
> On May 26, 2004, [Miller] was indicted on one count of aggravated murder in violation of R.C. 2903.01(B) with two robbery specifications pursuant to R.C. 2929.04(A)(3) and 2929.04(A)(7), and one count of aggravated robbery in violation of R.C. 2911.01(A)(3).  [Miller] entered a plea of not guilty on all charges.  On February 8, 2005, following a seven-day trial, the jury returned a guilty verdict on the aggravated murder and aggravated robbery charges, including one of the robbery specifications.  [Miller] was subsequently sentenced to life in prison without the possibility of parole.

*State v. Miller*, No. CA2005-02-048, 2006 WL 1519602, at *1 (Ohio Ct. App. June 5, 2006).

The victim, Paul Brown, was last seen alive on Saturday, March 23, 2002.  *See id.* at *2.  After attending a family birthday party, relatives had dropped him off at a bar called BW3's around 9:30 p.m.  *Id.*

> Video surveillance placed Brown at a nearby Meijer store where he withdrew $50 from an ATM at approximately 10:00 p.m. . . . . [T]he forensic pathologist who performed Brown's autopsy[] opined that Brown may have died anywhere from the late hours of Saturday, March 23[,] to Monday, March 25.  However, . . . Brown probably died before Monday.

*Id.*

As a substantial part of his defense at trial, Miller had planned to present evidence that a third party, Scottie Guenther, had actually robbed and killed Brown. The defense called as its first witness Tamara Holcomb, who had dated Guenther for about two-and-one-half weeks in mid-March 2002. After Holcomb testified regarding her drug habits and those of Guenther during that period, the State objected to the relevance of her testimony. The court overruled the State's objection. Holcomb then resumed her testimony, explaining that Guenther had been unemployed in March 2002 and "would hustle people out of their money" to support his drug habit; that he had been "out of control" when using or seeking out drugs; that, while they were both on drugs at a crack house on Heaton Street in Hamilton, Guenther had attacked a woman, "pull[ing] a knife up on her and thr[o]w[ing] her up against the wall and h[o]ld[ing] the knife to her throat"; and that there had been another "episode of violence" between Guenther and a man named JR at the same crack house later that month.

When the State again objected to Holcomb's testimony, the parties, at sidebar, argued at length about the relevance of evidence showing Guenther's whereabouts, drug usage, and violent outbursts during March 2002. Defense counsel stated, for example,

> [O]ur next witness is going to say that on the day Paul Brown was found missing, demonstrated missing, Guenther was at [Roberta Turner's crack] house and left and came back acting out of character, white face and wet, like he had been in a creek, and said I have to get rid of my clothes, and got rid of his clothes and threw it in a dumpster . . . .

However, defense counsel's arguments did not persuade the court. When defense counsel asserted, for example, that Guenther's drug addiction gave him a motive to rob Brown, the court responded, "That's true with probably 1,000 people in Hamilton." The court also asked, rhetorically, whether anyone could place Guenther at BW3's, and then explained:

> These are things we need to know if you are going to take somebody in here and say this is a drug addict and on that particular night had wet clothes and wanted to get rid of his clothes. That's not enough, and especially when it is at least three miles or four miles away. Heaton Street is about three miles away from BW3's.

The court concluded that defense counsel had not shown a sufficient nexus between Guenther and the Brown murder to overcome the State's objection. As a result, the court

sustained the objection, struck Holcomb's testimony from the record, and instructed the jury not to consider her testimony during their deliberations. At that point, the court excused the jury for the day and gave defense counsel the opportunity to proffer additional evidence of Guenther's involvement in the murder.

To make the proffer, defense counsel called Detective Cifuentes, the investigating officer assigned to the case, to question him about several witness statements and the investigation more generally. Detective Cifuentes confirmed that Guenther had been a suspect and that police had interviewed him multiple times. Guenther had been named as a suspect after Timothy Tidwell had called police on March 28, 2002, to report that Guenther and Holcomb "had gone out on Saturday night, early Sunday morning, and had come back to his [Tidwell's] house and had bloody clothes." Later in the day on March 28, Tidwell had delivered a bag of clothes to the police, but the clothes had been Holcomb's, not Guenther's, and they had not been stained with blood. Tidwell had explained to police that there were no stains because Holcomb had washed the clothes, but Detective Cifuentes testified that the clothes in the bag had smelled bad and were obviously dirty. By March 28, Guenther had been arrested for an unrelated breaking and entering; after Tidwell's call, a detective had gone to the county jail to "inspect [Guenther's] clothes for the presence of blood" and assess whether Guenther's footprints matched those found at the scene of the crime. The detective had found no blood on Guenther's clothes or shoes.

Tidwell also gave a statement on March 28. Tidwell said that when Guenther and Holcomb had come back to the house late on March 23 or early on March 24, they had said "they had just made a big score" and "that they had hurt somebody and got their money." Tidwell claimed he could not remember what clothes Guenther had been wearing, but Tidwell could remember having seen blood on Guenther's gym shoes. Detective Cifuentes remarked that Tidwell must have remembered what Holcomb had been wearing, because Tidwell had brought Holcomb's clothes to the police station on the same day he had given the statement.

The police followed up on Tidwell's statement by taking a statement from Holcomb on March 29. Detective Cifuentes testified, however, that by the time police had taken Holcomb's statement, "we were not feeling that Scottie Guenther was a suspect anymore,

but we still ha[d] to pursue the lead and peruse [sic] the complaint." In her statement, Holcomb said she had been hanging around Tidwell's house for a couple of days, starting on Wednesday or Thursday night before the weekend that Brown was killed. She also said, in relevant part, that she had "smoked dope with Tim," "slept almost all day Saturday, and Saturday night," and gone with Tim to visit his mother after waking up on Sunday morning.

Continuing their proffer, defense counsel read from two statements Guenther had given to police. In one statement, Guenther said there were rumors he had killed Brown and that "[i]t was so bad I couldn't get a girlfriend because they all thought I [had] killed him." In the other statement, made six days before the start of Miller's trial, Guenther said, "I did not kill Paul Brown. I did not know Paul Brown," and "I have never told anyone that I have killed Paul Brown." Defense counsel noted that police had given Guenther a polygraph. Detective Cifuentes testified that police had seen the need for a polygraph "because even after we cleared [Guenther], rumors kept coming to surface and with the rumors coming to surface with no concrete evidence, we wanted to put to bed once and for all whether or not he could have been involved, and he was advised of that."

Next, defense counsel asked Detective Cifuentes about Cindy Lou Rader's statement, taken by police almost a year after the Brown murder. Rader, who claimed to have been Guenther's girlfriend, indicated that Guenther had been released from jail on March 8, 2002, but that police had arrested him at her house on March 26 for a March 20 breaking and entering. Believing Guenther to be increasingly violent, police had looked for him at Rader's house on March 23 and had told her to call them if he resurfaced.

Before Guenther's arrest on March 26, Rader had last seen him on the afternoon of March 23, the same day Brown went missing. According to Rader, that afternoon, Guenther had taken a pocketknife off a dresser, opened and closed it, and then embraced her and given her what felt like a goodbye kiss. Guenther had told her, "I'm going to kill somebody"; then he had left.

Rader remembered that when Guenther had returned on March 26, he had been wearing different clothes. While packing, he had told her that "he wanted to go to Sojourner." Detective Cifuentes disagreed with defense counsel's interpretation of what Rader said Guenther had said next:

Q        . . . . [H]e makes a strange quote, this is on the 26th, right?
A.       Yes.
Q.       And his quote is, he would like to kill twice?
A.       No, that's not what this says.
Q.       Made a strange quote to me and said he would like to kill twice?
A.       He would like to kill me twice.
Q.       No.
A.       In other words, he says it two times.
Q.       The copy I have has the "me" is [sic] crossed out?
A.       The "me" is written in.
Q.       On my copy it's written—it's crossed out.

Rader also stated that a woman named Tanya Holland had told her that Guenther had killed Brown. Rader recalled that Holland had said, "[Guenther] came to me and Tammy, and he was all covered in blood and him and J Dog were together and they came to [me]" and that Guenther had told Holland, "I killed him for ten bucks. All I got was ten bucks." Holland had allegedly also told Rader that "Tammy" had cleaned the blood off Guenther and J Dog.

To follow up on Rader's statement, police had taken a statement from Holland. Holland said Guenther had been at her house before he had gone to Rader's on March 26. Holland then described Guenther's activities during the weekend before his arrest: Guenther had been at the crack house and "hanging around a guy named L Dog"; Guenther and L Dog had left for a couple of hours in a car that belonged to one Darryl Hall, without Hall's knowledge, although a woman named Amanda had given them permission; Guenther and L Dog had come back with $10 around 5:00 a.m. and had tried to buy crack from a dealer named JR; Guenther had then left for Rader's house. At this point in the proffer, defense counsel stated, "I would . . . like to indicate that this statement indicates that Scottie Guenther left and came back with unexplained money."

On cross-examination, however, the State pointed out that Holland's statement continues:

Tammy Hatton was not the person that was with me in the room, Amanda was. We did not clean up anyone that was bleeding. Scottie never bragged to me about killing anybody. I listened to what you read to me from Cindy Rader. She is not telling it like I told her. Scottie and J Dog never came to me. I never cleaned up anyone that had blood on them. If I had seen Scottie come to me with blood on him and I knew he killed somebody, I would have

turned him in. I like Scottie, but I don't believe in killing anybody for anything, and I would have turned him in . . . .

Defense counsel also asked Detective Cifuentes about a statement given by Katherine Powers about a year after the murder. Powers stated that she had talked to Chris Rutledge, who had told her about an encounter between Travis Wright and Guenther. Rutledge had told Powers that Guenther had approached Wright wanting to trade a jacket for cocaine and that Guenther had told Wright "he had just got done beating a guy to death."

Rutledge gave his own statement to police at about the same time as Powers. Rutledge said that Guenther had shown up at Rutledge's house at some unspecified time; that Guenther had been "[a]cting wild and crazy"; that he had said he had "just" robbed and beat up a gay man, cut off the man's penis, and hidden the man's body in some woods; and that he had wanted to sell a Cleveland Brown's jacket and some other items for drugs. Rutledge claimed he had learned about the Brown murder while watching television a few days later.

Defense counsel also introduced the statement of Tyrone Jasper, made almost two years after the murder. Jasper said Eddie Mack had heard Guenther confess to killing Brown. Detective Cifuentes testified, however, that a year after Jasper had given the statement, he had made a second statement, which implicated Miller, not Guenther. Similarly, although Eddie Mack had told police that "Guenther did it," Mack later recanted that statement and implicated Miller.

Defense counsel concluded their proffer by arguing for the admission of their evidence:

> The fact that Scott Guenther is out during the relevant period, which is March 8th to March 26th, and he is seen handling a knife on March the 23rd, the same day that Paul Brown is missing, making expressions of intent to kill on that particular day. Coming back on March the 26th and making further comments about killing and to his girlfriend who he would—who you could consider that he would provide that information to because of their relationship, consistent with the fact that during those three days in which we can account for Scott Guenther, the proffered evidence in the case that he is at a crack house on Heaton Street, and we have identified the witnesses at that crack house in the statements, Roberta Turner and Mike Sandlin [the apparent proprietors of the crack house], who were in our discovery, who are going to testify during that period of time, those three days, after he leaves with a knife and says he's going to kill somebody, and

he shows up at the house and leaves and comes back a period of hours later in a different demeanor than he was when he left, wet, and getting rid of his clothes.

That alters the probabilities of the issue of identity in this case. The standard of relevance is low. You had some questions about whether or not there would be any connection or sense that Guenther came from Heaton Street to the west side and back. We now have evidence that he was in a car from the witness statements.

Whether or not this Scottie Guenther defense is believable or not is not an issue for the Court. All you have to do, we submit, is determine whether or not the evidence that we could permit, that we would present would alter the probabilities.

Moreover, we have presented evidence that Scottie Guenther would have a motive to kill somebody because he is a drug addict. He didn't have a job. That's already been testified to, and he had to steal and rob and do what he could to get his money to satisfy his fixes. There is certainly enough relevant evidence here to at least go to the jury, so this man in a capital murder case can present a defense.

And I think one of the more important things that we learned from our proffer today is that immediately the day after the body is found the Hamilton police have focused on Scottie Guenther. There is a reason for that. We just followed it up.

Nevertheless, the court excluded the Guenther evidence from trial:

The action that we are here trying is whether the evidence presented by the State of Ohio can convince this jury beyond a reasonable doubt that Richard Miller committed a crime of aggravated murder and with a specification of aggravated robbery.

. . . .

The fact that there were other suspects in this murder and that the investigation was conducted by the police department and apparently[,] according to the detective[,] that satisfied that there was no evidence linking Guenther to the murder of Paul Brown[,] does not mean that all of that evidence, which they accumulated, all of a sudden becomes admissible.

. . . I have found no link . . . between Guenther, the actions on the 23rd and the 24th and the 25th—to have anything to do with Paul Brown.

I'm sure there are a lot of crimes that were committed in the City of Hamilton during that period of time. The fact that Guenther committed some crime and people indicated that he committed some crime and, again, I agree with counsel for the prosecution, most of what we have heard today ha[s] been chit-chat innuendo, and much of it has been disclaimed by the person that ma[d]e[] the statement.

And presenting that to a jury, in my estimation, absolutely confuses the issue. If it is minimally relevant, I think it is still excluded by virtue of

[Evidence Rule] 403(A),**[1]** which although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues, or of misleading the jury.

> . . . The fact that there were other suspects and that the defense wants to present evidence of other suspects that the police developed, and who were eventually cleared, to me, is either not relevant or even minimally relevant[, and] is excluded by Evidence Rule 403(A).

After the case went to the jury, defense counsel made an additional proffer for the record. Defense counsel indicated that Holcomb's testimony would have described in greater detail the "episode of violence" between Guenther and JR, including the fact that Guenther had put a knife to JR's throat and attempted to take drugs from JR's person. Holcomb also would have testified that on March 23, 2002, Guenther had threatened to hit her in the face with a beer bottle because he wanted her drugs, and that she had then taken him to the crack house on Heaton Street. Defense counsel would have called Roberta Turner to testify that Guenther had frequented her crack house in March 2002 and that, a few days after the March 20 breaking and entering, Guenther and Holcomb had come over to the house and then left for a few hours. Upon their return, Guenther had been "crestfallen and ashen and acting out of character," "wet from head to toe," and had "said he needed to get rid of his clothes because he had been involved in a crime." Turner would have testified that she had thrown the wet clothes in a dumpster and lent him others. Finally, defense counsel would have called Dina Stingley, who would have testified that in 2003 "Turner had told her all of the things . . . put forward in this proffer."

Miller sought review of his conviction in the Court of Appeals of Ohio, arguing that the trial court had violated his constitutional right to present a defense by excluding the Guenther evidence. *Miller*, 2006 WL 1519602, at *1, *4. The court of appeals concluded, however, that the trial court had not abused its discretion in finding the evidence only minimally relevant or in excluding the evidence under Rule 403(A). *Id.* at *6. The court of appeals distinguished the United States Supreme Court's then-

---

**[1]**Ohio Rule of Evidence 403(A) closely resembles Federal Rule of Evidence 403.

month-old decision in *Holmes v. South Carolina*, 547 U.S. 319 (2006), because the trial court here had not excluded the third-party perpetrator evidence arbitrarily, but rather had given Miller the opportunity to show a nexus between Guenther and the Brown murder. *Miller*, 2006 WL 1519602, at *7. And unlike in *Holmes*, the trial court's exclusion of the evidence was unrelated to the strength of the State's case; indeed, the trial court's decision was based on defense counsel's failure to demonstrate a sufficient nexus between Guenther and the murder. *Id.*

After the Supreme Court of Ohio declined review, *State v. Miller*, 854 N.E.2d 1094 (Ohio 2006) (table), Miller petitioned for habeas relief in the Southern District of Ohio, arguing that he was denied his right to present a defense under the Compulsory Process and Due Process Clauses. The parties unanimously agreed to proceed before a magistrate judge, who denied Miller's request for relief. Because the United States Supreme Court had decided *Holmes* before Miller's conviction became final, the magistrate judge identified *Holmes* as clearly established federal law for purposes of this habeas review. The magistrate judge then concluded that the "Court of Appeals decision here was not contrary to or an objectively unreasonable application of *Holmes* because *Holmes* confirms the constitutionality of a rule (Fed. R. Evid. 403) which is substantively identical to the Ohio evidence rule applied in this case." Nor did the state courts base their application of Rule 403(A) on an unreasonable determination of the facts in light of the evidence presented. The magistrate judge observed that "[m]any of the 'facts' suggestive of Guenther's guilt are not in any way specific to the crime in question (e.g., motive, drug addiction, presence in Hamilton, Ohio, at the relevant time period, possession of a knife with threats to use it)." In addition, "[m]any of the facts are not of evidentiary quality and really consist of leads in police investigations which proved not to be accurate." The magistrate judge issued a certificate of appealability and this appeal followed.

**II.**

The Court of Appeals of Ohio neither based its review of Miller's conviction on an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2), nor unreasonably applied clearly established federal law, *id.* § 2254(d)(1). Thus we affirm the denial of Miller's petition for habeas relief.

The state courts were not unreasonable in concluding that the evidence Miller proffered did not show a sufficient nexus between Guenther and the Brown murder. No witness placed Guenther in the area of BW3's or Meijer—where Brown was last seen alive—on the night of March 23, 2002. Indeed, at most, Miller can show that Guenther was at a crack house in Hamilton that night and had access to a car. Miller asserts that Guenther had a motive, because Guenther was an addict who stole for his fixes and the evidence suggests Brown was robbed. But this argument renders Guenther a suspect in every Hamilton robbery from March 8 to March 26, 2002, without making it any more likely Guenther committed this particular robbery. Miller also makes much of the fact that Rader's testimony put a knife in Guenther's hands on the day Brown was last seen alive, but Miller points to no evidence to suggest that the pocketknife Guenther took from Rader's house was in fact the murder weapon. Moreover, Holland's statement that Guenther left the crack house with L Dog sometime during the weekend before March 26 and returned in the early morning hours with $10 does not mean that Guenther robbed and killed for the money, let alone that he robbed and killed Brown. And the testimony that Guenther showed up at the crack house sometime after March 20 "acting out of character," "wet from head to toe," and desiring to dispose of his clothes because he "had been involved in a crime," again, does not necessarily lead to the conclusion that Guenther robbed and killed Brown.

Miller's reliance on Guenther's alleged confessions is also misplaced. For example, the fact that Guenther allegedly told Rader he was "going to kill somebody" does not mean that he killed Brown—or anyone else, for that matter. In addition, as mentioned, Jasper and Mack both retracted their earlier statements that Guenther had confessed to the crime. And with regard to Rutledge's statement, Miller acknowledges

on appeal that "there was no evidence that Brown's penis had been cut off." This inconsistency detracts from the probative value of Rutledge's statement.

Finally, on a somewhat tangential note, if Guenther were concerned enough about getting caught to insist that someone dispose of his clothes and shoes, it is unclear why he would have paraded around to Tidwell's house, Rutledge's house, and Roberta Turner's crack house immediately after he had allegedly killed Brown. Miller has made no attempt to reconcile the timing of these visits. Because the evidence fails to show a significant nexus between Guenther and the murder, the state courts' exclusion of the evidence was not based on an unreasonable determination of the facts.

Nor did the state courts' exclusion of the evidence result from an unreasonable application of clearly established federal law.[2] The state trial court found the Guenther evidence, at best, only minimally relevant and excluded the evidence on the basis that any probative value was substantially outweighed by the danger of confusing the issues or misleading the jury. Although "prevailing notions of fundamental fairness . . . require that criminal defendants be afforded a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), a "defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

In *Holmes*, the United States Supreme Court expressly recognized that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326. The Court cited, as an example, Federal Rule of Evidence 403. *Id.* And the Court noted that a "specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with

---

[2]*Holmes* is clearly established federal law for purposes of this habeas review, because the United States Supreme Court decided *Holmes* before Miller's conviction became final. *See Onifer v. Tyszkiewicz*, 255 F.3d 313, 316-17 (6th Cir. 2001). Miller's conviction did not become final until after the Supreme Court of Ohio declined review in October 2006, *see State v. Lynn*, 214 N.E.2d 226, 229 (Ohio 1966), five months after the decision in *Holmes*. Indeed, the Court of Appeals of Ohio considered and distinguished *Holmes* in reviewing Miller's conviction on direct appeal. *Miller*, 2006 WL 1519602, at *6-7.

which they are charged." *Id.* at 327. The Court then quoted, in a parenthetical, this excerpt from *American Jurisprudence*:

> [T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.

*Id.* (quoting 40A Am. Jur. 2d *Homicide* § 286 (1999)). Thus the state courts' weighing of the probative value of the Guenther evidence against its tendency to confuse the issues or mislead the jury was entirely consistent with United States Supreme Court precedent. So too was the exclusion of the evidence on the ground that it failed to show a sufficient nexus between Guenther and the murder.

Miller's argument that weaknesses in the State's case weighed in favor of admitting the Guenther evidence is unavailing. In *Holmes*, the United States Supreme Court disapproved of a South Carolina rule that had required a trial court to focus on the *strength* of the State's case when deciding whether to admit defense evidence of a third party's guilt. *Holmes*, 547 U.S. at 329, 331. The South Carolina Supreme Court had affirmed the state trial court's exclusion of such evidence, holding that "where there is strong evidence of [a defendant]'s guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the [defendant]'s own innocence." *Id.* at 324 (quoting *State v. Holmes*, 605 S.E.2d 19, 24 (S.C. 2004)). In other words, under the South Carolina rule as applied, "[i]f the prosecution's case [wa]s strong enough, the evidence of third-party guilt [wa]s excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues." *Id.* at 329. In holding the South Carolina rule incompatible with due process, the United States Supreme Court explained that "[j]ust because the prosecution's evidence, if credited, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case." *Id.* at 330 (emphasis omitted). In much the

same way, here, assuming, as Miller suggests, that the State's case against him provided only weak support for a guilty verdict, that fact would not strengthen Guenther's connection to the murder, nor would it render the proffered evidence admissible. Miller's argument thus fails.

Because the state courts' exclusion of the Guenther evidence was not an unreasonable application of clearly established federal law, Miller is not entitled to the habeas relief he seeks.

## III.

For the foregoing reasons, the denial of Miller's petition for habeas relief is affirmed.

———————————

**CONCURRENCE**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, concurring. I concur fully in the lead opinion. My colleagues' application of the established law regarding state regulation of a defendant's constitutional right to present a defense, here, third-party guilt, is unassailable. I write separately, however, to comment upon the questionable foundations of that law.

As the lead opinion correctly details, the story proffered by Richard Miller's attorney—that Scottie Guenther was the true perpetrator—relied heavily on circumstance, inference, ambiguous statements, and shaky witnesses. But, as the lead opinion also hints, *ante* at 14, and as a review of the record reveals is actually the case, so too was the state's case against Miller based on circumstance, inference, ambiguous statements, and shaky witnesses.[1] One could argue that the state's circumstantial case against Miller was comparatively stronger than Miller's circumstantial case against Guenther, but the difference is only in shades of gray and the fact remains that both cases were highly circumstantial. So why was the state allowed to go to the trial jury with its circumstantial theory but Miller was not?

The grand jury. In a criminal prosecution, the only real filter between the state's theory of the case and the trial jury is the grand jury. The state, in its sole prosecutorial discretion, has the opportunity to bring any evidence or testimony before the grand jury, regardless of whether it would be admissible at trial and without it being subject to cross examination or rebuttal by the accused, to try to establish that there is probable cause to believe that the accused committed the crime. Once the grand jury has found probable

---

[1]This is not to say that there was insufficient evidence to convict Miller, for there most certainly was. But, based on our extremely deferential sufficiency of the evidence standard, so too would Miller's evidence against Guenther have been sufficient evidence to convict had the state decided to focus its fire on Guenther rather than Miller and had the jury convicted.

cause, the state's theory is almost certainly going to the trial jury.**2**  And many have observed that the modern grand jury is not exactly a robust check on prosecutorial discretion. *United States v. Navarro-Vargas*, 408 F.3d 1184, 1195 (9th Cir. 2005) (en banc) (citing numerous commentators and courts that have suggested that the modern grand jury is but a rubber stamp for the prosecution); *United States v. Budd*, 496 F.3d 517, 537 n.9 (6th Cir. 2007) (Cook, J. concurring in part and dissenting in part) (citing the adage that the grand jury "would indict a ham sandwich").

By contrast, to get his theory of third-party guilt before the trial jury, the defendant must convince a trial judge that there is a "nexus" between the alleged third-party perpetrator and the crime and must defend his proffer from the state's cross-examination and argument. This initial filter on the defense's theory is significantly more restrictive than that placed on the state's theory of the case. First and foremost, the respective gatekeepers are drastically different. The defendant must get his theory past a trial judge—learned in the law, a veteran of the courtroom, appropriately skeptical of everything she hears, and viewing everything with an eye towards its ultimate admissibility at trial—instead of a panel of lay citizens that, by most accounts, unquestioningly accepts the prosecutor's assertions as gospel. Second, the state presents its story to the grand jury without questioning or rebuttal by the accused, whereas the defendant's story to the trial judge is subject to cross examination and challenge by the state. The third difference between the state's task and the defendant's is the conceptual difference between "probable cause" and "nexus." Any attempt to describe and compare the two concepts amounts to little more than a demonstration of the limits of the English language. However, in reading the cases, the nexus inquiry seems materially different, and more strict, than probable cause.

In sum, we have a situation in which the state, which bears the ultimate burden to prove its theory of the accused's guilt beyond a reasonable doubt, needs only get its

---

**2**It is true that the trial judge will rule on the admissibility of discrete pieces of evidence, but those rulings are made in light of the fact that the grand jury has already blessed the state's theory of the case. So, as long as there is some admissible evidence to support the state's theory, that theory will go to the trial jury.

theory past the low hurdle of the grand jury before it can get to the trial jury.  On the other hand, the defendant, whose theory needs only identify a reasonable doubt to the trial jury, faces a significantly higher burden before he may bring his theory before the trial jury.  This makes no sense to me, but this the law allows.

I have no doubt that if Miller's attorney had made his proffer before a grand jury instead of a trial judge, the grand jury would have found probable cause against Guenther and gone on about its business without a hesitation.  More to the point, in all my years of dealing with these cases, I have seen no convincing constitutional justification for placing a higher threshold before a criminal defendant than that placed before the state.  Most authorities justify the situation simply by noting that it has always been this way.  While admirable for its clarity, this justification sheds no light on its constitutional provenance, be there any.[3]

To be clear, I am not suggesting that the defense should have access to the grand jury, as that proposition would find no purchase in the text of the Constitution.  I suggest only that the courts should have to find specific constitutional justification before endorsing a system in which the threshold for a defendant's theory to go before a trial jury is higher than the threshold for the state's theory to reach that same jury.  If, as I suspect, there is no such specific constitutional justification, then we should work toward a system in which the barrier to entry is substantively the same for the defense as it is for the state.

I respectfully concur.

---

[3]Indeed, the Supreme Court recently highlighted the fact that no one knows where in the Constitution a criminal defendant's right to present a defense resides, the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, or the Sixth Amendment's Confrontation Clause. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  Everyone just agrees that it is in there somewhere.  But the question of what the state permissibly may do to regulate the right to present a defense shows that it is not enough to agree that the right exists without pinpointing where the right resides.  We cannot analyze a given evidentiary regulation with any specificity without knowing what specific constitutional doctrine is at issue.