# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Joseph Martin Swaringen, Appellant.

Appellate Case No. 2022-000928

———————

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

———————

Opinion No. 6109
Heard November 14, 2024 – Filed April 23, 2025

———————

**AFFIRMED**

———————

Clarence Rauch Wise, of Greenwood, for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Attorney General Mark Reynolds Farthing,
both of Columbia, and Solicitor William Walter Wilkins,
III, of Greenville, all for Respondent.

———————

**THOMAS, J.:** Joseph Martin Swaringen appeals his conviction of trafficking
methamphetamine more than twenty-eight grams, but less than one hundred grams,
and the corresponding sentence of life in prison without the possibility of parole.
On appeal, he argues the trial court erred in (1) failing to direct a verdict as to the
trafficking charge because the substances in the four individual bags were
commingled before testing; (2) holding the chain of custody was properly
established; (3) failing to charge the lesser-included offense of simple possession
of methamphetamine; (4) admitting the seized items into evidence when the

officers handling the evidence failed to comply with the South Carolina Law Enforcement Division (SLED) regulations for handling evidence pursuant to section 44-53-485 of the South Carolina Code (2018); (5) failing to suppress the evidence found in the motorcycle saddlebag; and (6) failing to give the requested jury charge. We affirm.

**FACTS**

Appellant, riding a motorcycle, was involved in a motor vehicle accident and attempted to flee the scene. The other driver restrained Appellant until emergency medical personnel arrived. Appellant was taken by ambulance to Prisma Health Greenville Memorial (Greenville Memorial) for treatment, which led to the discovery of methamphetamine in his personal belongings and his subsequent arrest. Appellant was indicted for trafficking methamphetamine. The case proceeded to trial, but a mistrial was declared on the first day.

Prior to the first trial, the State filed notice of its intent to seek life without parole. Defense counsel filed a "general suppression motion" seeking the exclusion of the evidence discovered in Appellant's personal belongings. Defense counsel argued, *inter alia*, the inventory search of the motorcycle saddlebag constituted an improper search because the hospital employee who conducted the initial search was acting as a government agent under a lease agreement (the Lease).[1] Defense counsel presented the Lease and argued that the GHA is a political subdivision, therefore its employees are government agents. The State rebutted, arguing there were no constitutional violations because the drugs were found by a hospital employee prior to and without intervention from law enforcement. The trial court conducted an in limine hearing to address the Fourth Amendment issues.[2] Edmonds testified her inventory search of Appellant's belongings was pursuant to hospital policy, and the procedure was conducted for the benefit and protection of both the hospital and the patients. Pursuant to that protocol, the belongings of all patients brought to the emergency room were inventoried, logged, and secured if

---

[1] The Lease is between the Greenville Health Authority (GHA), lessor, a political subdivision of South Carolina, and Upstate Affiliate Organization, lessee, a South Carolina nonprofit organization. Greenville Memorial was one of the locations contained within the Lease.

[2] The trial court heard testimony from (1) paramedic and first responder, Alex Henry; (2) patient liaison at Greenville Memorial, Lisa Edmonds; (3) Officer Chris Miller from the GHA Police Department; and (4) Prisma Health Investigator Alvin Harrison.

anything valuable was found.  Edmonds believed the inventory procedure policy was a written one, and she confirmed she prepared an inventory list of Appellant's belongings but was not personally in possession of the list because she was no longer employed by the hospital.  Edmonds verified she was not instructed by law enforcement to conduct the search.  Defense counsel argued the search was unreasonable in violation of the Fourth Amendment because there was no written policy for inventory searches by hospital employees.  The trial court found there was no search in violation of the Fourth Amendment, stating, "Critical help is a private or profit hospital, not a government actor. . . .  It was not for the specific purpose of incriminating a patient but for the protection of both the hospital and the patient. . . .  It was an inventory by a hospital employee, not a search by law enforcement."

On the first day of trial, a mistrial was granted due to a late-received chain of custody form.  Prior to jury qualification at the second trial, the parties stipulated that any motions heard and ruled upon at the first trial would be in effect during this trial.  Because Investigator Harrison would not be testifying at the second trial, a stipulation of hospital video evidence was filed with the trial court.  The stipulation read, in pertinent part:

> There is no video from inside the trauma bay as those cameras were not operational at the time.  Alvin Harrison did ask for those cameras to be fixed due to their inoperability.  [He] did not save all of the potentially relevant video.  The video of the loading dock stops before EMT [personnel] retrieve the saddlebag from the ambulance as well as before Lisa Edmonds physically transfers the alleged contraband to Officer Miller.

At the second trial, the State called EMT Michael McKnight.  He testified that, upon arriving at the hospital, he transferred Appellant to the trauma team and gave a verbal report to hospital staff.  McKnight then brought the saddlebag to the outdoor security post in the trauma bay where the on-duty security guard conducted a brief search of the bag and returned it to McKnight.  McKnight then placed the items on the trauma nurse's pedestal in the trauma room and advised the staff present in the room that the belongings were Appellant's.

Edmonds reiterated her testimony from the first trial.  She was presented with CCTV footage from the hospital on the night of the incident and testified to seeing herself on camera and conducting the inventory of Appellant's belongings.  Edmonds stated that while inventorying the belongings, she found several baggies

containing what she suspected were drugs. She immediately contacted campus security and gave the bag containing the substances to the responding officer, Officer Miller. Officer Miller testified that on the night of the incident, he was acting as security for the hospital. He testified he was called to the trauma bay to retrieve suspected drugs, was handed the bag by Edmonds, and then transported the bag to his office to conduct a field test on the substance. The field test positively identified methamphetamine. Officer Miller took photos of the baggies containing the substances, packaged the substances, placed them into a secure evidence locker, and filled out a Property and Evidence sheet.

The State then sought to admit a Property and Evidence form prepared by the officers from the GHA Police Department and defense counsel objected. As support for the objection, defense counsel asserted the form was missing information required by SLED's regulations for the handling of controlled substances. In rebuttal, the solicitor noted Officer Miller and other witnesses would be testifying about what happened to the drugs, which would permit defense counsel to cross-examine them about any discrepancies that existed between their testimony and what was listed on the form. The trial court ultimately admitted the document. Officer Eric Keiper of the GHA Police Department testified he removed the items from the evidence locker and transported them to the GHA Police Department Property and Evidence facility where he requested a laboratory analysis from the Greenville County Crime Laboratory. Another evidence custodian, Kara Bennick, testified to receiving the items at Property and Evidence. James Armstrong, supervising chemist at the Greenville County Crime Laboratory, testified that he received the baggies of crystal-like substances from Property and Evidence. He could not weigh the bags individually because "all the bags had loose material around them and it was kind of mixing, so it was a total weight." Armstrong's photographs of the baggies of methamphetamine were admitted into evidence.[3] Additional evidence was presented about the property in Appellant's possession at the time of the incident, which included $682.25 in cash.

Following Armstrong's testimony, the State rested, and the defense made a motion for a directed verdict on the grounds that Armstrong could only conclusively say that less than one one-hundredth of a gram, the amount he tested, was methamphetamine, and there were issues as to where exactly the methamphetamine was found within Appellant's personal belongings. The court

---

[3] The photographs depicted four plastic baggies containing a uniform-in-appearance white crystal-or-rock-like substance having weights–with packaging included–of 21.2 grams, 6.7 grams, 4.13 grams, and 2.16 grams.

denied the motion, finding there was enough evidence presented to render the issues as questions for the jury. Defense counsel also argued the trial court should suppress the evidence based on an improper chain of custody and noncompliance with SLED regulations pursuant to section 44-53-485 of the South Carolina Code. The trial court denied the motion finding, "proof of chain of custody need not negate all possibility of tampering so long as a chain of possession is complete. And I think we have testimony that makes it complete." The court further found, "the totality of all the documents comply with the regulations." Finally, defense counsel orally asked the court to instruct the jury it must acquit Appellant if the chain of custody was not proven beyond a reasonable doubt. Defense counsel submitted a requested jury charge that read:

> In order to convict the defendant, the [S]tate is required to prove that the items seized were in fact the same items analyzed by the laboratory. To accomplish this the [S]tate is required to establish a complete chain of custody that the items seized were in fact the same items analyzed. If you find the [S]tate has not established beyond a reasonable doubt this complete chain of custody, then you are to find the defendant not guilty.[4]

The trial court declined to charge the jury with the requested jury charge. Appellant was convicted as indicted, and the trial court sentenced Appellant to a mandatory term of life imprisonment without parole. This appeal followed.

## STANDARD OF REVIEW

### Issue 1

An appellate court reviews the denial of a directed verdict by viewing the evidence and all reasonable inferences in the light most favorable to the State. *State v.*

---

[4] Below the requested charge, defense counsel cited to *State v. Carter*, 344 S.C. 419, 425, 544 S.E.2d 835, 837-38 (2001):

> The evidence that a saliva sample was placed in the kit simply contradicts the State's evidence negating tampering, thereby creating a factual issue. In sum, we find the evidence of a discrepancy in the contents of the kit does not render the blood sample inadmissible but goes only to its weight as credible evidence.

*Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A case should be submitted to the jury if there is any substantial evidence, either direct or circumstantial, which tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced." *Brown v. State*, 307 S.C. 465, 468, 415 S.E.2d 811, 812 (1992). "[O]ur duty is not to weigh the plausibility of the parties' competing explanations. Rather, we must assess whether, in the light most favorable to the State, there was substantial circumstantial evidence from which the jury could infer [the defendant's] guilt." *State v. Larmand*, 415 S.C. 23, 32, 780 S.E.2d 892, 896 (2015).

Issues 2, 4, and 5

"The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'" *State v. Commander*, 396 S.C. 254, 262-63, 721 S.E.2d 413, 417 (2011) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847-48 (2006)). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).

Issues 3 and 6

The appellate court must view the jury charge as a whole and in light of the evidence and issues presented at trial. *State v. Simmons*, 384 S.C. 145, 178, 682 S.E.2d 19, 36 (Ct. App. 2009). "A trial court's decision regarding jury charges will not be reversed where the charges, as a whole, properly charged the law to be applied." *State v. Wharton*, 381 S.C. 209, 213, 672 S.E.2d 786, 788 (2009). A jury charge is appropriate if it is substantially correct and adequately covers the law applicable to the case. *State v. Foust*, 325 S.C. 12, 16, 479 S.E.2d 50, 52 (1996). An appellate court will only reverse a trial judge's decision regarding jury instructions when that decision constitutes an abuse of discretion resulting in prejudice. *Clark v. Cantrell*, 339 S.C. 369, 389-90, 529 S.E.2d 528, 539 (2000).

**LAW/ANALYSIS**

**A.     Motion for Directed Verdict Based on Commingling of Evidence**

Appellant argues the trial court erred in failing to direct a verdict as to the trafficking charge when the chemist testified the substances in the four individual bags were commingled. We disagree. Appellant maintains the testimony presented during trial was insufficient to establish that what was contained in the

four separate bags was, in fact, methamphetamine because the contents of the bags were commingled by the State prior to analysis.  However, we find the State provided sufficient evidence to send the issue to the jury.  *See State v. Cherry*, 348 S.C. 281, 286, 559 S.E.2d 297, 299 (Ct. App. 2001) (finding the trial court properly denied the motion for a directed verdict on the charge of possession with intent to distribute crack cocaine, and that the question of whether the crack cocaine found on Cherry's person was for personal use or distribution was for the jury to decide), *aff'd*, 361 S.C. 588, 593, 606 S.E.2d 475, 477 (2004).

In *Cherry*, this court found the combination of factors constituted evidence that would reasonably tend to prove Cherry intended to distribute crack such that the matter was properly submitted to the jury.  *Id.*  The evidence presented warranting submission to the jury was as follows:

> [T]he arrest occurred in a high crime area known for violence and drug activity; Cherry had a small bag containing eight rocks of crack cocaine on his person; he had no crack pipe or other drug paraphernalia indicating the crack cocaine was for his personal consumption; he had $322.00 cash on his person, mostly in twenty dollar bills; and Officer Parker testified a single rock of crack cocaine is typically sold for twenty dollars.

361 S.C. at 594-95, 606 S.E.2d at 478.

South Carolina courts have yet to address the significance or suppressibility of drug evidence if it is shown to have been commingled prior to lab testing.  However, other jurisdictions have addressed this issue.  In *People v. Coleman*, a police officer commingled one small bag of white powder that he field-tested for drugs with fourteen other small bags that he did not test.  909 N.E.2d 952, 958 (Ill. Ct. App. 2009).  The defendant argued the commingling constituted tampering, alteration, or substitution of the substance in the bags.  *Id.*  However, the appellate court found that the mixing did not change the substance so as to increase the defendant's criminal liability.  *Id.* at 962.  The defendant failed to rebut the State's prima facie case regarding the chain of custody, and the forensic scientist's testing of the combined contents determined that all of it was cocaine.  *Id.*  In *Sheffield v. State*, the Court of Appeals of Texas, Tyler, found the commingling of pills was not harmful because the chemist's tests established that at least one of the pills delivered by the defendant contained the controlled substance.  635 S.W.2d 862, 864 (Tex. Ct. App. 1982).  The Supreme Court of Florida addressed the commingling of powdered cocaine prior to lab testing in *Greenwade v. State*, 124

So.3d 215 (Fla. 2013). There, the court found that the evidence did not establish the quantity element of a trafficking charge because the State combined, tested, and weighed contents of nine small bags found in defendant's possession instead of testing each bag for cocaine individually before commingling and weighing their contents. *Id.* at 230-31. Importantly, however, the *Greenwade* court distinguished certain situations in which the testing and weighing of drugs after commingling is proper:

> While we hold that the State must chemically test every individually wrapped packet of white powder seized in order to establish the statutory threshold weight for trafficking, we emphasize that this rule only applies when the substance discovered is one that poses an identifiable danger of misidentification, such as the white powder discovered in this case. If the chemical composition of the substance seized does not pose a danger of misidentification, the State is not required to chemically test individually wrapped packets in order to establish the requisite statutory weight for trafficking. *See Bond* [*v. State*], 538 So.2d [499,] 500 [Fla. Dist. Ct. App. 1989] (holding that the rule in *Ross* [*v. State*, 528 So.2d 1237 (Fla. Dist. Ct. App. 1988)] did not apply to rock cocaine); *see also Pama* [*v. State*], 552 So.2d [309,] 312 [(Fla. Dist. Ct. App. 1989)] (similar holding with respect to marijuana).

*Id.* at 229.

We find sufficient evidence was presented to establish the random samples collected from the uniform substance, which collectively weighed 29.65 grams, tested positive for methamphetamine during both an officer's initial field testing and upon subsequent analysis at the laboratory, which supported a logical and rational conclusion that the tested, and similar looking untested items, were the same substance: methamphetamine. The substance at issue here does not pose an identifiable danger of misidentification, as was the issue in *Greenwade*. The substance here was not an indistinct powder-like cocaine. The uniform substances were crystal and rock-like in appearance. Accordingly, we find this issue was properly sent to the jury.

## B.    Chain of Custody

Appellant argues the trial court erred in holding the chain of custody was properly established because testimony at trial and the hospital video[5] established the investigating officers left the emergency room without the alleged drugs and no testimony ever established when they obtained possession of the alleged drugs after their departure from the emergency room. We disagree.

Our supreme court has held, "a party offering into evidence fungible items such as drugs or blood samples must establish a complete chain of custody *as far as practicable*." *State v. Pulley*, 423 S.C. 371, 377, 815 S.E.2d 461, 464 (2018) (emphasis added) (quoting *State v. Hatcher*, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011)). "Courts have abandoned inflexible rules regarding the chain of custody and the admissibility of evidence in favor of a rule granting discretion to the trial courts." *Hatcher*, 392 S.C. at 94, 708 S.E.2d at 754. When multiple people have handled the analyzed substance, "the identity of individuals who acquired the evidence and what was done with the evidence between the taking and the analysis must not be left to conjecture." *State v. Sweet*, 374 S.C. 1, 6, 647 S.E.2d 202, 205 (2007). "Testimony from each custodian of fungible evidence, however, is not a prerequisite to establishing a chain of custody sufficient for admissibility." *Id.* at 7, 647 S.E.2d at 206. "Where other evidence establishes the identity of those who have handled the evidence and reasonably demonstrates the manner of handling of the evidence, our courts have been willing to fill gaps in the chain of custody due to an absent witness." *Id.*

We find the chain of custody was established. The trial court heard testimony from EMTs, hospital personnel, campus security, property and evidence custodians, and the chemist. We find each step of the chain of custody has been properly established based on the testimony from the time it was received to the time it was tested. *See State v. Trapp*, 420 S.C. 217, 233, 801 S.E.2d 742, 750 (Ct. App. 2017) (holding the trial court does not need to "account for every minute of the custody and control of the evidence" but must ensure that the evidence is what it purports to be and has not been altered in any material respect). Appellant attempts to liken

---

[5] We are unpersuaded by Appellant's argument that the hospital video established there was no handoff of the belongings from Edmonds to Officer Miller. Prior to the start of trial, the parties stipulated that, due to certain cameras being inoperable on the night of the incident, the handoff was never recorded. Appellant repeatedly argues Edmonds never gave Officer Miller the substances, however both Edmonds and Officer Miller testified this transaction occurred, and both Appellant and the State knew prior to trial that such interaction was not recorded, due to no fault of either party.

this case to *Pulley*; however, this case is distinguishable because in *Pulley*, our supreme court found the chain of custody was not properly established because the cumulation of the following errors equated to conjecture: (1) the express denial of handling the cocaine by responding officer, Officer Brewer; (2) the stipulation of a missing link by the State; (3) the subsequent reversal by Officer Brewer that he did in fact take the cocaine from the scene; and (4) the State's failure to produce testimony from the other responding officer, Officer Craven, indicating how he obtained possession of the cocaine after the drugs were seen on the hood of Officer Brewer's car. 423 S.C. at 378-79, 815 S.E.2d at 465. Here, hospital staff and security personnel were able to identify each link in the chain from the moment the belongings were transferred to the hospital to the time they were tested. There are no missing links or express denials from those who handled the drugs. We hold the trial court did not err in finding the chain of custody properly established as far as practicable.

## C.     Lesser-Included Jury Charge

Appellant argues the trial court erred by failing to instruct the jury on the lesser-included offense of possession of methamphetamine because, due to the commingling of the evidence, the jury was not required to accept that the entirety of the substance found in his belongings was methamphetamine. We disagree.

"A trial judge is required to charge a jury on a lesser included offense if there is evidence from which it could be inferred that a defendant committed the lesser offense rather than the greater." *State v. Drafts*, 288 S.C. 30, 32, 340 S.E.2d 784, 785 (1986). "The mere contention that the jury might accept the State's evidence in part and reject it in part is insufficient to satisfy the requirement that some evidence tend to show the defendant was guilty only of the lesser offense." *State v. Geiger*, 370 S.C. 600, 608, 635 S.E.2d 669, 674 (Ct. App. 2006). In *State v. Raffaldt*, our supreme court held "it is the amount of cocaine, rather than the criminal act, which triggers the trafficking statute and distinguishes trafficking from distribution and simple possession." 318 S.C. 110, 117, 456 S.E.2d 390, 394 (1995). "If the amount of cocaine, or any mixture containing cocaine, is ten grams or more, the trafficking statute is applied." *Id.* That is, when all the evidence indicates the defendant was dealing in quantities of cocaine over ten grams, the defendant is only entitled to charges on trafficking, not distribution or possession. *Id.*; *see also Matthews v. State*, 300 S.C. 238, 241, 387 S.E.2d 258, 260 (1990) (finding when there is conflicting evidence as to whether the amount of the contraband is sufficient to invoke the trafficking statute, the court should submit charges to the jury on both trafficking and possession with intent to distribute; where, however, the "undisputed evidence is that the amount involved exceeds the

minimum trafficking amount, then only the trafficking charge should be submitted to the jury"). In *State v. Kirkpatrick*, this court also applied the rule from *Matthews* and held that if the undisputed evidence shows that the amount of drugs involved exceeds the minimum trafficking amount, then only the trafficking charge should be submitted to the jury without instruction on the lesser-included offense of possession with intent to distribute. 320 S.C. 38, 46, 462 S.E.2d 884, 890 (Ct. App. 1995).

We find the evidence presented did not warrant a lesser-included instruction. There was evidence at trial reasonably tending to prove Appellant's guilt of trafficking methamphetamine and from which a jury could fairly and logically deduce his guilt of that offense. The evidence and testimony presented during trial established that randomly-selected sampling taken from a similar-looking substance found inside four plastic baggies that had been hidden together in Appellant's belongings tested positive for methamphetamine. This evidence supported a rational and logical conclusion that the entire substance, which collectively weighed more than twenty-eight grams, was methamphetamine that was possessed by Appellant. Further, the jurors heard testimony from the officers, emergency personnel, hospital employees, evidence custodians, and a chemist who handled the substances from the moment Appellant was transported to the hospital until the lab testing. Finally, additional circumstances surrounding the accident and Appellant's other personal belongings discovered at the hospital supported a charge of trafficking. Appellant was found with almost $700 in cash on his person. Immediately following the accident, for which he was not at fault, Appellant acted irate and tried to flee the scene on foot. He only remained at the crash site when the other driver and a bystander "pinned him down" while they waited for emergency personnel. We find this combination of factors is sufficient for the jury to infer the amount of drugs found in Appellant's saddlebag supported the charge of trafficking. The trial court sufficiently instructed the jury on the elements of the trafficking charge and what a guilty verdict would require. The trial court did not err in refusing to instruct the jury on the lesser-included charge of possession.

**D.     Suppression Based on Compliance with SLED Regulations Pursuant to Section 44-53-485**

Appellant argues the trial court erred in admitting the seized items into evidence when the officers handling the evidence failed to comply with the SLED regulations for handling evidence pursuant to section 44-53-485. While we acknowledge there may have been flaws in the reporting of the evidence, like the trial court, we do not believe the adequate remedy here, as Appellant requests, is the total suppression of the evidence. We affirm.

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the [General Assembly]." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "The legislature's intent should be ascertained primarily from the plain language of the statute." *Ex parte Cannon*, 385 S.C. 643, 655, 685 S.E.2d 814, 821 (Ct. App. 2009) (quoting *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken*, 354 S.C. 18, 23, 579 S.E.2d 334, 336 (Ct. App. 2003)). "If, however, the language of the statute gives rise to doubt or uncertainty as to legislative intent, the construing court looks to the statute's language as a whole in light of its manifest purpose." *Id.* "The construing court may additionally look to the legislative history when determining the legislative intent." *Id.* Section 44-53-485 deals with the handling of seized controlled substances. The pertinent subsection reads: "Controlled substances seized pursuant to this article must be inventoried, reported, audited, handled, tested, stored, preserved, or destroyed pursuant to procedures promulgated by [SLED]." § 44-53-485(A).

At trial, as part of his challenge to the sufficiency of the chain of custody, defense counsel argued the officers failed to comply with SLED's regulations, which he maintained required the trial judge to find an incomplete chain of custody and suppress the drug evidence. In response, the trial judge asked defense counsel if he had any case law to support that particular argument, and defense counsel responded solely by pointing to the "must" language in section 44-53-485(A). Unconvinced, the trial judge noted the legislature did not include any repercussions, including suppression, for noncompliance in that particular statute. Defense counsel conceded the legislature could have added a remedy if it so desired. Nevertheless, defense counsel continued to maintain the officers had not complied with the requirements of SLED's regulations. The trial court declined to suppress the evidence. In doing so, the trial judge found the documentation related to the handling of Appellant's methamphetamine either complied or substantially complied with SLED's regulations and a complete chain of custody had been established. We agree the documentation substantially complied. Further, the trial judge noted the legislature would have included a remedy of suppression for a violation of the statute, which had never been interpreted in the manner being advanced by defense counsel despite being in place since 1992, if one had been intended. Appellant cites to specific instances that rose to the level of noncompliance with the statute. We agree with the trial court's ruling denying suppression based on the statute's plain language. Nowhere in the language of the statute does the legislature provide a suppression remedy if the handling of the evidence is not sufficient. Just as the trial judge recognized, the legislature elected not to include any remedy, including suppression, for a violation of that statute; therefore, suppression was not warranted regardless of any statutory

noncompliance in light of the trial court's correct conclusion a complete chain of custody had been established.

## E.     Evidence Suppression Based on Search by Private Citizen

Appellant argues the trial court erred in failing to suppress the evidence found in the saddlebag because hospital staff acted as government agents pursuant to the Lease so Fourth Amendment protections apply.  Additionally, Appellant argues because the hospital policy for inventorying patient belongings was not written, it was not a valid policy and therefore constituted an unreasonable search.  We disagree.  "The fourth amendment is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government and without the participation or knowledge of government officials."  *State v. McSwain*, 292 S.C. 206, 207, 355 S.E.2d 540, 541 (1987).  Defense counsel relied on the United States Supreme Court's decision in *Ferguson v. City of Charleston*[6] and *Burton v. Wilmington Parking Authority*[7] to argue hospital staff members constituted government agents because of the Lease.

Appellant's reliance on *Ferguson* is misplaced because the circumstances are distinguishable.  In *Ferguson*, the United States Supreme Court was tasked with deciding "whether a state hospital's performance of a diagnostic test to obtain evidence of a patient's criminal conduct for law enforcement purposes [wa]s an unreasonable search if the patient had not consented to the procedure."  532 U.S. at 69-70.  In *Ferguson*, staff members at the Medical University of South Carolina (MUSC), a public hospital, grew increasingly concerned with the increase in the use of cocaine by pregnant patients.  *Id.* at 70.  Because of the growing concern, MUSC staff offered to cooperate with the city in prosecuting mothers who tested positive for drugs at birth.  *Id.* at 70-71.  A task force was created that consisted of MUSC representatives, police, and local officials to develop a policy and set forth procedures for identifying and testing pregnant patients suspected of drug use.  *Id.* at 71.  The policy required that a chain of custody be followed when obtaining and testing patients' urine samples and contained police procedures for arresting patients who tested positive.  *Id.* at 71-72.  Finally, the protocol added the threat of law enforcement intervention and prescribed prosecutions for drug offenses, child neglect, or both, depending on the stage of the pregnancy and whether she tested positive at the time of delivery.  *Id.* at 72-73.  The Supreme Court found the tests themselves, and the reporting of positive test results to police were unreasonable

---

[6] 532 U.S. 67 (2001).
[7] 365 U.S. 715 (1961).

searches absent the parties' consent, and in light of the policy's law enforcement purpose. *Id.* at 83-85. Here, the trial court heard testimony from Edmonds, who repeatedly confirmed she conducted inventory searches for all incoming patients with no direction from law enforcement. We find the trial court properly denied the defense's motion because Edmonds's inventory served no purpose but to protect the hospital and its patients. Edmonds was not seeking out criminal activity when she inventoried Appellant's belongings. In comparison, the hospital staff in *Ferguson* was explicitly working in conjunction with city prosecutors to seek out and punish mothers who tested positive for drugs when they gave birth. Testimony from employees at the hospital corroborated Edmonds's statements that the purpose of the inventory search procedure was to protect the hospital and patients from guns or other weapons. Additionally, Edmonds testified when she inventories patient belongings and finds large sums of cash, or multiple credit cards, or other tangible items of value such as jewelry, she secures those for the benefit of the patients. Unlike *Ferguson*, the circumstances of this inventory were not law enforcement motivated.

Next, Appellant relies on the Supreme Court's holding in *Burton*, which stated, "Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself." 365 U.S. at 726. However, the Supreme Court further clarified the "limits of [its] inquiry" by finding:

> Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested. Owing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present.

*Id.* at 725-26.

In *Burton*, a man was refused service at a restaurant solely because of his race. *Id.* at 716. The restaurant was operated by a private owner under a lease agreement in a building financed by public funds and owned by the city's parking authority (the

Authority), which was an agency of the State of Delaware. *Id.* The court looked to several factors to determine whether state action was present and ultimately determined:

> Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.

*Id.* at 724.

We find the addition of all the circumstances here shows hospital employees were not acting as government agents when they inventoried Appellant's belongings. Further, even if the search was not considered to be a private search, we find Appellant's suppression motion was correctly denied because Appellant's methamphetamine was found during the course of a valid inventory search that was properly conducted by a hospital employee pursuant to routine hospital policies and procedures, which rendered the search constitutionally reasonable under the circumstances involved.

## F.    Flaws in Chain of Custody Jury Charge

Appellant argues the trial judge erred in failing to give the requested charge as to how the jury should address any flaws in the chain of custody. We disagree.

A trial judge in South Carolina is constitutionally prohibited from making any comments that could be construed as offering an opinion on the facts of the case. *See* S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters of fact, but shall declare the law."). South Carolina courts have yet to address whether a jury instruction on flaws in the chain of custody would be appropriate. However, other jurisdictions have held a trial court's failure to deliver a jury instruction concerning the chain of custody did not render the trial unfair. *See United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir. 1993) (finding the jury was allowed to hear and evaluate evidence on gaps in the chain of custody, there was no proof of tampering with the exhibits, and the jury resolved the issue consistent with its verdict, indicating that the absence of the instruction did not affect the fairness of the trial).

Even in his requested jury charge, defense counsel included the citation to *Carter*, which stated a factual issue was created when "[t]he evidence that a saliva sample was placed in the kit simply contradicts the State's evidence negating tampering, thereby creating a factual issue." 344 S.C. at 425, 544 S.E.2d at 837-38. The *Carter* court further found the evidence of a discrepancy in the contents of the kit did not render the blood sample inadmissible but only went to its weight as credible evidence. *Id.* at 425, 544 S.E.2d at 838. In *Carter*, the court found no missing link in the chain of custody because all custodians testified and were able to be cross-examined. *Id.* at 424-25, 544 S.E.2d at 837. Here, like our supreme court in *Carter*, we find the chain of custody was properly established as far as practicable; therefore, any discrepancies created at trial are purely factual issues and the trial court is prohibited from instructing the jury on matters of fact. We further find the trial court's jury charge was appropriate because it was substantially correct and covered the law applicable to the case. When viewing this particular jury charge as a whole and in light of the evidence presented at trial, we find the final instructions were sufficient, even without the inclusion of a chain of custody instruction. Particularly, the trial court reminded the jurors they were to determine the weight and value of each particular piece of evidence. Throughout the trial, defense counsel highlighted the discrepancies in the chain of custody through examination of the chain of custody witnesses. The jury was capable of forming its own conclusions as to the sufficiency and accuracy of the chain of custody based upon testimony. We hold the trial court did not err in denying Appellant's requested jury charge on chain of custody.

## CONCLUSION

Based on the foregoing, Appellant's conviction and sentence are

**AFFIRMED.**

**HEWITT and VINSON, JJ., concur.**